**UNITED STATES of America,**
**Plaintiff,**

v.

**John V. LINDSAY, as Mayor of the City of New York, et al., Defendants.**

**Docket No. 72-C-1362.**

United States District Court,
E. D. New York.

April 13, 1973.

Robert A. Morse, U. S. Atty. Eastern District of New York, Brooklyn, N. Y., Whitney North Seymour, Jr., U. S. Atty. Southern District of New York, New York City, Herbert Stern, U. S. Atty. District of New Jersey, Newark, N. J., by Bruce Smith, Daniel Riesel, Henry Brachtel, Bart Schwartz, Asst. U. S. Attys., for plaintiff.

Norman Redlich, Corporation Counsel City of New York, New York City, by John R. Thompson, First Asst. Corporation Counsel, for defendants, Lindsay, Kretchmer, Lang and City of New York.

## DECISION AND ORDER

TRAVIA, District Judge.

The genesis of this now consolidated lawsuit can be traced to three (3) separate actions instituted by the United States on July 18, 1972. Originally, the three (3) suits were filed in separate districts, *viz.*, Southern District of New York; Eastern District of New York; the District of New Jersey. The scope and content of all three (3) complaints were identical except insofar as the named corporate defendants may have differed.[1] In all three (3) actions, both municipal defendants (primary) and private corporate defendants were named.[2] Because of the obvious similarity of these "separate suits", an order to consolidate the actions in the Eastern District of New York was signed, on consent of all parties, on December 11, 1972.

For the purposes of the present decision, this court does not intend to rule *in toto* on the many legal issues attendant to a case of this nature. Nor does the court purport to establish all the rights and liabilities of all parties in this action. Rather, at this time, the court will only address itself to the two (2) motions presently pending. The first motion the court is concerned with herein was made by the defendants, The City of New York, its Mayor, John V. Lindsay, its Administrator of the Department of Environmental Protection, Jerome Kretchmer, and its Commissioner of the Department of Water Re-

1. *See* file numbers 72–C–952; 72–C–1327; 72–C–1362.

2. The several corporate defendants included certain electroplating corporations as representative of the total class of electro-

platers. *See* Plaintiff's Compl., ¶ 7–8, at 2, 3. For the purposes of this decision, only the municipal defendant and its officers are considered the primary defendants.

sources, Martin Lang.[3] This motion was filed on October 13, 1972 and requested, *inter alia,* the court to dismiss this action pursuant to Rule 12(b) of the F.R. of Civ.P. or, that in the alternative, the court refer the case to the Environmental Protection Agency of the United States under the doctrine of primary jurisdiction.

The second motion with which the court is concerned was made by the plaintiff, United States Government, by way of an Order to Show Cause, filed herein on December 13, 1972. By this motion, the plaintiff seeks, pursuant to Rule 56 of the F.R. of C.P., summary judgment in favor of the Government and against The City of New York and its named municipal officials.[4]

## THE ALLEGATIONS

Before considering the applicable law on the subject, a brief summary of the allegations in the complaint and the respective motions will be necessary to isolate and crystalize the specific legal issues involved.

Although the complaint and its numerous allegations are extensively detailed, the plaintiff's suit, in essence, is intended to prevent *all the defendants,* (municipal and corporate), from continuing to deposit industrial pollutants into the navigable water of the United States.[5] The plaintiff employs basically two legal theories in support of its complaint. First, the complaint alleges that all the defendants are violating certain sections of the Rivers and Harbors Appropriation Act of 1899 [Title 33 U.S. C. § 401 et seq.; 30 Stat. 1151] by discharging industrial pollutants primarily (though not only) *via* the municipal sewer system into the navigable water of the United States. More specifically, the complaint charges that the defendants' activities are in violation of Title 33 U.S.C. § 407 [The Refuse Act], Title 33 U.S.C. § 411 and Title 33 U.S.C. § 441 [The New York Harbor Act].[6] The second theory asserted by the plaintiff is that the municipal defendant and its officers have created a public nuisance under the federal common law.[7]

With respect to the relief requested in the complaint, suffice it to say that the Government seeks to enjoin and restrain all the defendants from any future activities which would continue the discharge or deposit of industrial pollutants into the navigable water of the United States in violation of the federal common or statutory law.[8]

This action is properly before this court since the Federal Water Pollution Control Act of 1972, by its very terms saves actions, such as the action now before the court, commenced prior to the

---

3. This motion to dismiss was *not* joined in by the individual private corporate defendants named, who have to date merely responded by the service of their answers.

4. The Government's motion *was not directed against* the private corporate defendants. (Emphasis added.) Further, the plaintiff's motion seeks judgment *only* on the basis of the alleged statutory violations. *See* the Motions At Bar *infra.*

5. It appears that the specific bodies of water involved are those waters touching the shoreline of the City of New York. Although the complaint specifies several "claims for relief" for the purposes of this decision the parties are the United States Government, The City of New York and certain municipal officers, and the motion of the plaintiff is directed to a vio-

lation of Title 33 U.S.C., Sections 407 and 441.

6. The exact language and meaning of these particular sections will be discussed at length *infra.*

7. *See* Plaintiff's Compl., ¶ 105, at 40. Interestingly enough, the plaintiff does not seek summary judgment on this "claim for relief."

8. The particular requests are enumerated, at some length, in the plaintiff's complaint, at 42–44. This court is in full support of the general rule that a court should not consider the legal merits of a proposition from the point of view of the relief requested. However, this court does note that to grant the plaintiff's requests for relief, if legally warranted, may amount to duty beyond the scope of judicial realism.

date of its enactment. The court is, however, compelled by forthrightness and candor to refer to a question posed by it during the oral argument of these motions and the reason for such question.[9] In a statement issued in November, 1972, the United States Attorney, Southern District of New York, quite understandably, stated among other things: "Almost without warning the rug was pulled out from under this entire enforcement effort." He further stated: "Congress enacted amendments to the Federal Water Pollution Control Act, just before it adjourned last month, effectively repealing The Refuse Act of 1899 as it applies to ongoing industrial discharges." He continued, stating: "That simple prohibition against harmful discharges was superseded by new, complex administrative procedures as part of a generally commendable, comprehensive national abatement program." Congress has for many years been working and holding hearings on the problems of water pollution which culminated in the enactment of the 1972 Federal Water Pollution Control Act. The very able United States Attorney, at the time of the commencement of this action, was aware of the action by Congress and that the proposed new law would bring within its provisions, by specific reference, municipal sewer systems. This knowledge must have prompted the early start of this action under the provisions of The Refuse Act of 1899, which contains a provision that exempts refuse "flowing from streets

and sewers . . . .", forcing this court's ruling on whether the exemption applies in the case at bar to municipal sewers.

## THE MOTIONS AT BAR

The court will now turn to the aforementioned motions. The City of New York's motion to dismiss the complaint is made solely on the ground that the particular statutes alleged to have been violated do not apply to municipal sewer systems. In fact, the City argues that the clear language of the statutes specifically exempts all sewage "flowing from streets and sewers and passing therefrom in a liquid state . . . ." [10] As for the plaintiff's "common law" theory, the defendant City argues that "federal common law may be fashioned only 'where no applicable federal statute exists.' " [11] Thus, the City argues that the Federal Water Pollution Control Act, and its several amending acts, show a clear congressional intent to limit the Government's common law remedies to situations not covered by the statutes.[12] Finally, the City argues that because of this suit's unique complexity, and because of the administrative and other statutory remedies available to the Government, this court should employ the doctrine of primary jurisdiction and refer the case to the Environmental Protection Agency of the United States (hereinafter the E.P.A.).[13]

As for the second motion now pending before this court, it is considerably less

9. The Federal Water Pollution Control Act was enacted on October 18, 1972, scarcely three months after the commencement of this action. *See also* transcript of January 5, 1973 at 49–52 and Note 8 *supra*.

10. 33 U.S.C. §§ 407, 441. The defendants do not specifically challenge Title 33 U.S.C. § 411 inasmuch as that section relates only to the punishment for violating Title 33 U.S.C. §§ 407–409.

11. *See* Defendants' Supplemental and Reply Memorandum of Law, (filed January 2, 1973), at 16.

12. The Federal Water Pollution Control Act was originally enacted in June of 1948, (62 Stat. 1155). Since that time, however, the Act has been continually amended. The most recent amendment, and indeed the most comprehensive amendment, was completed on October 18, 1972. *See* Pub.L. 92–500, 86 Stat. 816. For a detailed list of all the amendments *See* Title 33 U.S.C. § 1251 (Supp.1973).

13. In an effort to fortify this claim, the defendant, The City of New York, has informed this court on several occasions, during the pendency of this action, that they are continuing negotiations with the regional office of the E.P.A.

complex and involved. The plaintiff has simply requested that the court grant summary judgment against the defendants because they are clearly acting in violation of the specified federal statutes, *viz.*, The Refuse Act (Title 33 U.S.C. Sec. 407) and The New York Harbor Act (Title 33 U.S.C. Sec. 441).

Thus, after a consolidated reading of both motions, the issues now pending before this court may be stated as follows:

1. Do the "exception clauses" of The Refuse Act (Title 33 U.S.C. § 407) and The New York Harbor Act (Title 33 U.S.C. § 441) exempt municipal sewer systems from prosecution under these sections of the Rivers and Harbors Appropriation Act?

2. May the Government sue a municipal defendant for alleged acts of polluting under the theory of common law nuisance notwithstanding the fact that there is existing a federal statutory remedy, viz., The Federal Water Pollution Control Act?

3. Should the court employ the doctrine of primary jurisdiction and, thus, refer this case to the E.P.A.?

### THE EXCEPTION CLAUSES

The Refuse Act (§ 407) and The New York Harbor Act (§ 441) are both products of late nineteenth century legislative proceedings.[14] In part, these Acts provide:

The Refuse Act, Title 33 U.S.C. § 407—

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft . . . or from the shore, wharf, manufacturing establishment . . .

any refuse matter of any kind or description whatever *other than that flowing from streets and sewers and passing therefrom in a liquid state*, into any navigable water of the United States . . . ." (Emphasis added.) Title 33 U.S.C. § 407.

The New York Harbor Act, Title 33 U.S.C. § 441—

"The placing, discharging, or depositing, by any process or in any manner, of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind, *other than that flowing from streets, sewers, and passing therefrom in a liquid state*, in the waters of any harbor subject to sections 441 to 451b of this title . . . is strictly forbidden . . . ." (Emphasis added.) Title 33 U.S.C. § 441.

As was stated earlier in a brief margin notation, the legislative history of both these statutes indicates that they are, in fact, products in whole or in part, of prior legislation. A simple reading of the plain language of these statutes, without more, creates an impression that they were intended only as anti-obstruction statutes to facilitate navigation. Such a "restrictive reading", however, has been held to be inappropriate by a majority of the Supreme Court in its decision in United States v. Standard Oil Co.[15] In that case, Mr. Justice Douglas, writing for the majority, and commenting on the meaning of The Refuse Act, stated in part:

"It is plain from its legislative history that the [injury] to our watercourses sought to be remedied [by the Refuse Act] was caused in part by obstacles that impeded navigation and in part by pollution . . . ." Unit-

---

14. The Refuse Act can be traced to at least the Act of August 18, 1894, c. 299, 28 Stat. 363. It was later incorporated into the more massive Rivers and Harbors Appropriation Act of 1899 (30 Stat. 1152). Likewise, the New York Harbor Act more accurately named "New York Harbor, Harbor of Hampton Roads, and

Harbor of Baltimore Act", dates back to at least the Act of June 29, 1888, c. 496, 25 Stat. 209. This Act was also incorporated from a prior enactment. *See* Act of August 5, 1886, c. 922, 24 Stat. 329.

15. 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966).

ed States v. Standard Oil Co., *id.* at 228–229, 86 S.Ct. at 1429, 16 L.Ed.2d at 495.

In light of Mr. Justice Douglas' statement *supra*, one must conclude that the legislators of the late nineteenth century intended to criminally prosecute all parties whose actions either obstructed navigation or endangered the environment unless they came within the exception clause.[16]

Without exception, most scholars would agree that as a result of Mr. Justice Douglas' decisions in the *Standard Oil Co.* case, and its companion case United States v. Republic Steel Corp. et al., *infra*, The Refuse Act became a newly discovered, or at least newly revived, tool to protect the environment. Whether or not one considers the majority's opinion to have "manufactured a result in view of the pollution crises in this country", one must clearly be impressed by the number of cases since *Standard Oil Co.* that have carried the ecological standard forward *via* the gilded sword of The Refuse Act.[17]

For the purposes of the case at bar, it is also significant to note that The New York Harbor Act (Title 33 U.S.C. § 441) also appears, in the view of the majority in United States v. Standard Oil Co., *supra*, to enjoy an equally prestigious position in the ecological arsenal.[18]

In considering the meaning of the "exception clauses" in these two statutes, we must begin with the now, well celebrated, Supreme Court case of United States v. Republic Steel Corp. et al.[19] After examining virtually every reported case that has ever considered the meaning of the "exception clauses", it has become apparent that Mr. Justice Douglas' majority opinion in *Republic Steel* is in fact the backbone of all subsequent decisions on the subject. None of the cases had in their fact pattern a defendant municipality, whose municipal sewer system was involved, through which system flowed refuse from streets and sewers and passing therefrom in a liquid state.

The facts in *Republic Steel* may be summarized as follows: The defendant steel companies were sued for depositing industrial solids in the Calumet River, *via* their connecting sewer system, without first obtaining a permit to so depos-

16. It is interesting to observe that Mr. Justice Harlan, author of a dissenting opinion in United States v. Standard Oil Co., *supra*, did not totally agree with the majority interpretation that The Refuse Act was in part intended to protect the ecology. In fact, Mr. Justice Harlan stated:

"The purpose of § 13 [The Refuse Act] was essentially to eliminate obstructions to navigation and interference with public works projects . . . [T]he relevant inquiry is not the admittedly important concerns of pollution control, but Congress' purpose in enacting this anti-obstruction Act, and that appears *quite plainly to be a desire to halt . . . the depositing of obstructing refuse matter in rivers and harbors.*" (Emphasis added.) United States v. Standard Oil Co., *supra*, at 233, 86 S.Ct. 1431–1432, 16 L.Ed.2d 498.

17. *E. g.*, United States v. Pennsylvania Industrial Chemical Corp., 329 F.Supp. 1118 (W.D.Pa.1971) rev'd on other grounds, 461 F.2d 468 (3d Cir. 1972);

Connecticut Action Now, Inc. v. Roberts Plating Company, Inc., 457 F.2d 81 (2d Cir. 1972); United States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621 (3d Cir. 1967); United States v. Kentland-Elkhorn Coal Corp., 353 F. Supp. 451 (E.D.Ky.1973); United States v. Granite State Packing Co., 343 F.Supp. 57 (D.N.H.1972); United States v. City of Asbury Park, 340 F.Supp. 555 (D.N.J. 1972); United States v. Armco Steel Corp., 333 F.Supp. 1073 (S.D.Tex.1971); Bass Anglers Sportsman's Soc'y of America v. Scholze Tannery, Inc., 329 F.Supp. 339 (E.D.Tenn.1971); United States v. Vulcan Materials, 320 F.Supp. 1378 (D.N.J.1970); United States v. Florida Power and Light Co., 311 F.Supp. 1391 (S.D.Fla.1970).

18. *See* United States v. Standard Oil Co., *supra*, 384 U.S. at 227 and n. 4, 86 S.Ct. at 1428–1429 and n. 4, 16 L.Ed.2d at 494 and n. 4.

19. 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

it as required by the statute. It was alleged that the deposit of these solids over an extended period had a shoaling effect, which, in time, decreased the depth of the river channel. Thus, it was charged that the deposits were obstructing navigation.[20] The defendants argued that the shoaling effect was not an obstruction within the meaning of the statute.[21] In addition, they also claimed that because the deposits were carried *via* a sewer system and "passed therefrom in a liquid state", they came within the exception clause.

The Court, in considering the language of the statute and the contentions of the corporate defendants, had little doubt that the deposits were, in fact, constructed obstructions within the meaning of section 10 of the Rivers and Harbors Appropriation Act of 1899 (33 U.S.C. § 403). In speaking for the majority, Mr. Justice Douglas commented:

"The reach of § 10 seems plain. [E]xcavations or fills . . . that alter or modify 'the course, location, condition, or capacity of' a navigable river [may not] be made unless 'the work' has been approved by the Secretary of the Army . . . *We can only conclude that Congress planned to ban any type of 'obstruction,' not merely those specifically made subject to approval by the Secretary of the Army. . . .*" (Emphasis added.) United States v. Republic Steel Co. et al., *supra*, at 486, 80 S.Ct. at 887, 4 L. Ed.2d at 907.

It was, thus, clear that the deposits were "obstructions" and, therefore, the defendants' acts were in violation of the law unless the defendants could convince the Court that the "exception clause" in § 13 (The Refuse Act) applied to them. Again, however, the majority opinion outflanked the defendants' maneuver. Mr. Justice Douglas, in commenting on the meaning of the "exception clause", stated:

"As noted, § 13 [Refuse Act] bans the discharge in any navigable water of 'any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state.' The materials carried here are 'industrial solids,' as the District Court found. The particles creating the present obstruction were in suspension, not in solution. Articles in suspension, such as organic matter in sewage, *may* undergo chemical change. Others settle out. *All matter in suspension* is not saved by the exception clause of § 13. *Refuse flowing from 'sewers' in a 'liquid state' means to us 'sewage' . . . The fact that discharges from streets and sewers may contain some articles in suspension that settle out and potentially impair navigability is no reason for us to enlarge the group to include these industrial discharges . . . .*" (Emphasis added.) United States v. Republic Steel Co. et al., *supra*, at 490–491, 80 S.Ct. at 889–890, 4 L.Ed. 2d at 909.[22]

---

20. The District Court did conclude that the continued deposits did in fact result in a decrease in the river's depth in the vicinity of the defendants' steel mills. *See* United States v. Republic Steel Co. et al., *supra*, at 483–484, 80 S.Ct. at 886, (4 L.Ed.2d at 905.

21. It was contended by the defendants that the federal law prohibited the "construction" of any obstruction in the navigable waters of the United States. Thus, they argued that their deposits were not "a construction" within the plain meaning of the statute. *See* United States v. Republic Steel Co. et al., *supra*, at 486–487, 80 S.Ct. at 887, 4 L.Ed.2d at 907.

22. As is indicated by the above quote, the majority in *Republic Steel* agreed that some articles in suspension are saved by the exception clause. In the case at bar, the defendant Commissioner Lang submitted an affidavit which, if taken *in haec verba*, does establish that even drinking water in its "pure state" contains several articles in suspension. Clearly, the Supreme Court, in defining the meaning of refuse as it applies to the exception clause, did not intend to prohibit the discharge of all fluid simply because such fluids may contain some solids in suspension. *See also* the Rule 9(g) statements by both parties.

Thus, the Supreme Court, by a 5–4 decision, held that the exception clause was intended to permit "sewage" to flow from streets and sewers in a liquid state into the navigable waters notwithstanding the fact that "some articles" which could impair navigability were suspended in the liquid sewage.[23] However, the exception clause could not be a sanctuary for private manufacturing concerns whose deposits, consisting totally of industrial solids, are discharged *via* their sewer systems into the navigable waters to the extent that they obstruct navigation.

As in the *Standard Oil Co.* case, *supra*, Mr. Justice Harlan again authored the principal dissenting opinion. It was his position that the real legislative meaning of the exception clause is obscure. In commenting further, he observed:

"[It] is difficult to believe that a nineteenth century Congress, in carving out an exception for liquid sewage, meant to establish an absolute standard of purity which not only bore no relation to the prevailing practice of sewage disposal at the time, but also is impossible to achieve even under present-day technology . . . [T]he statute affords no basis for differentiating, as the Court [majority] suggests, between industrial and domestic refuse. . . ." (Emphasis added.) United States v. Republic Steel Co. et al., *supra*, at 506, 80 S.Ct. at 897–898, 4 L. Ed.2d at 917.

As a result of the Court's decision in *Republic Steel*, *supra*, courts throughout the country have used the majority's opinion defining "refuse" to protect the environment against any number or type of private industrial polluters.[24] Until very recently, virtually all reported cases belonging to the *Republic Steel* "genus" were suits by the Government against private corporations for their industrial pollution of the navigable waters of the United States. Also, in most instances, the vehicle of pollution, *viz.*, the sewer system, was, if not totally owned by the corporate defendants, at least controlled by them. The major exception to this interesting pattern of prosecutions and circumstances is the case of United States v. City of Asbury Park,[25] which was decided on February 17, 1972, scarcely six (6) months before the complaints in the case at bar were filed. In *Asbury Park*, *supra*, the Government brought an action against the municipality alleging that their practice of discharging "sludge", not "sewage", into the Atlantic Ocean, was in violation of Title 33 U.S.C. § 407. As expected, the Government relied on Mr. Justice Douglas' opinions in *Republic Steel* and *Standard Oil*. It is interesting to note that the facts in the case show that the municipal defendant was discharging the sludge from a single treatment facility into the Atlantic Ocean *via* fall out pipes which extended approximately 1000 feet into the Atlantic Ocean. This discharging was not directly from the streets and sewers of the municipality. Rather, the municipal sewers fed into the treatment facility which in turn "processed" the raw sewage and then during a three month period each year the remaining sludge was force pumped through the fall out pipes into the ocean. The court found that this sporadic process of force pumping sludge residue into the navigable water was in violation of The Refuse Act.[26]

23. Footnote 6 in the majority opinion does indicate, by way of example, that in some instances organic sewage may cause temporary or even permanent shoaling. This is not seen as a real problem, however, in view of the fact that the "[necessary] dredging is well attended to by the municipal authorities."

24. *E. g. See* cases cited in Footnote 17 *supra.*

25. 340 F.Supp. 555 (D.N.J.1972).

26. The clear language of the exception clause, *viz.*, "flowing from streets and sewers in a liquid state" would, on its face, appear to substantiate the court's

In view of the aforementioned decisions, certain observations seem appropriate before turning to the case at bar. The legislative purpose and intent of the "exception clauses" is at best obscure.[27] Likewise, the legislator's definition of the word "sewage" is also clouded. It is, however, submitted that the Court in *Republic Steel*, while defining "refuse" as simply "sewage", did not qualify "sewage" as only that material or substance which consists totally of organic wastes. In fact, in *Republic Steel*, the Court's single reference to organic material was made by way of example to show that in some instances even organic material may cause an obstruction to navigation.[28] Thus, this court does not believe that the Supreme Court's construction of The Refuse Act and its attendant "exception clause" necessarily prohibits a municipality from discharging all matter other than organic wastes.[29] The Supreme Court in 1960 was well aware of the fact that The Refuse Act legislators knew that the municipal sewer systems of the day did not, and probably could not, selectively discharge on the basis of organic content. There is no evidence to substantiate the belief that the majority in *Republic Steel* closed their eyes to the fact that many late nineteenth century municipalities had in fact developed complex sewer systems which were used to carry all sewage wastes from the inner city to a river bank or shoreline.[30]

▇ In essence, the Government's motion for summary judgment against The City of New York is based on the argument that the Supreme Court has held that a municipal sewer system which discharges, in part, sewage of a non-organic nature may not seek the protection of the "exception clause." Municipal sewers and urban industries discharging, in part, non-organic wastes into such sewers, are not post-Refuse Act phenomena. This court does not believe that the Government's position is supported in law or *a fortiori* in reason.[31]

The defendant in the case at bar is not a private industry discharging only

---

ruling. In the case at bar, however, this court is only considering the statutory claims in the plaintiff's complaint. If, however, the plaintiff had sought summary judgment on the question of defendants' deposit of sludge in the "Bite area", clearly a different situation would present itself. Under such circumstances this court might be hard pressed to discount the decision in the *Asbury Park* case *supra*.

27. Most authors on the subject, and indeed some judges, freely admit that the legislative meaning of the "exception clause" is obscure. *See* United States v. Republic Steel Corp. et al., *supra*, 362 U.S. at 506 and n. 26, 80 S.Ct. at 897, 4 L.Ed. 2d at 917 (Harlan dissenting). *See also* Rogers, Industrial Water Pollution and The Refuse Act: A Second Chance for Water Quality, 119 U.Pa.L.Rev. 760–761 (1971).

28. *See* United States v. Republic Steel Corp. et al., *supra* at 491 and n. 6, 80 S.Ct. at 890 and n. 6, 4 L.Ed.2d at 909 and n. 6.

29. *But cf.* United States v. Pennsylvania Industrial Chemical Corp., 329 F.Supp. at 1121 (W.D.Pa.1971); United States

v. Genoa, 336 F.Supp. 539 (W.D.Wis. 1972).

30. There is no question that most of the present day industrial centers *e. g.* New York, Chicago, Detroit, etc., were active industrial cities at the turn of the century. Further, in most instances, the manufacturing businesses within the city limits were permitted and did make use of the municipal sewer system. This practice must surely have been known to the legislative draftsmen. It is, therefore, not difficult to understand why some scholars view the "exception clause" as a concession to local state or municipal authorities to reasonably regulate and control their internal sewage disposal systems. Moreover, this view, suggested from the very language of the clause, seems more reasonable than the proposition that the clause was only a built-in permit to discharge totally organic wastes from streets and sewers etc. *See Rogers, supra,* note 27.

31. A casual reading of the "Discussion of Intent" contained in the Federal Water Pollution Control Act of 1972, (1972 U.S. Code Cong. and Admin.News [vol. 2]), would clearly show that the present-day

concentrated industrial solids into a navigable waterway. The sewer system of The City of New York is used not only to carry some industrial wastes, but also it is relied upon by virtually every resident and visitor to carry away the daily organic human wastes. Such a dependency by an entire city is surely distinguishable from the profit margins of a private corporation. The Government's almost total reliance on United States v. Republic Steel and its "family of cases" [32] is mislaid. Moreover, the City of Asbury Park, although a member of the "family" and a municipal defendant, was clearly not discharging sewage from streets and sewers in a liquid state.[33] The case is, therefore, plainly distinguishable from the case at bar.

After considering all the reported cases, the legislative history, such as it exists, the various memoranda submitted by both sides, and the recent legislative discussion on the meaning of The Refuse Act, this court is compelled to find that the discharges "flowing from the streets and sewers in a liquid state" of the defendant The City of New York,

are properly within the "exception clauses" of both The Refuse Act and The New York Harbor Act. This decision, however, should not be viewed as one designed to champion an anti-ecology movement. On the contrary, this court is aware that the continued pollution of our waterways is one of the more unfortunate facts of life in modern day America. There is no doubt that the defendants can, and must, through the aid of state and federal channels, improve its sewage treatment facilities. The Congress has gone to great lengths to update and close The Refuse Act gaps on the water pollution problem.[34] This court believes that such statutes as the Federal Water Pollution Control Act of 1972 [35] offers the Government sufficient and proper regulatory powers to correct the problem of water pollution caused by municipal sewer systems. These more recent enactments are certainly designed to close the gaps and foster local, state and federal cooperation, and thus, they offer a more appropriate remedy to the case at bar.[36]

As for the defendants' second claim, that the plaintiff may not resort to a

---

legislators are aware that The Refuse Act does not apply to municipal sewer systems. In commenting on the intention of the legislators with respect to § 402 of the FWPCA of 1972 it was stated, in part: "[T]he Refuse Act authority has significant gaps (*particularly its exemption of municipal waste treatment works*) that render it seriously inadequate as a means of implementation of a water pollution control program." (Emphasis added.) 1972 U.S.Code Cong. and Admin.News, at p. 3736. In the same discussion it was later stated: "In 1899, the Congress enacted a statute [the Refuse Act] which precisely prohibited the discharge of any 'refuse' (*subsequently defined by the Courts to include everything except sewage from municipalities*) . . . ." (Emphasis added.) *Id.* at p. 3736. Further evidence which indicates that today legislators are aware that The Refuse Act was not intended to apply to municipal sewer system discharges can be found in Hearing Before A Subcommittee of the Committee On Government Operations House of Representatives, 92nd., 1st Sess. pt. 1, at 1016, 1019 (1971). *See*

*also* H.R.Rep. No. 91–917, 91st Cong., 2nd Sess., at 15 (1970).

32. *See* cases cited in Note 17 supra.

33. *See* discussion of United States v. City of Asbury Park in the text *supra.*

34. *See* the discussion in footnote 31 wherein it is clearly evident that the legislative draftsmen of the 1972 amendment to the Federal Water Pollution Control Act were aware of the gaps and intended their new act to at last remedy the shortcomings of The Refuse Act.

35. Pub.L. 92–500, 86 Stat. 816.

36. These more recent amendments to the Federal Water Pollution Control Act are certainly the most far-reaching and comprehensive. Section 101 of this Act (Declaration of Goals and Policy) demonstrates that its enactment is intended to offer a total plan for the abatement of water pollution in the United States. This "national policy" it is hoped, will be achieved through a concentrated effort of federal, state and local cooperation. This approach is certainly a more reasonable and systematic approach to an obviously gigantic problem.

common law remedy, this court is not prepared, at this time, to determine such an issue.[37] The Government, in support of its common law claims for relief, refers this court to the Supreme Court case of Illinois v. City of Milwaukee.[38] It points out that the Supreme Court opinion held:

> "[T]hat litigants are not limited to the remedies specifically provided by Congress. . . ." Plaintiff's Supplemental Memorandum of Law In Opposition to Motion to Dismiss the Complaint, at 16–17 (filed January 17, 1973).

Further, it argues that the Government should be free to pick and choose its weapons for cleaning our waters. This court's reading of Illinois v. City of Milwaukee, *supra*, is not, however, in tandem with the plaintiff's interpretation. As was clearly stated by the Court:

> "The remedy sought by Illinois *is* [*was*] *not within the precise scope of remedies prescribed by Congress. . . .*" (Emphasis added.) Illinois v. City of Milwaukee, *supra*, at 103, 92 S.Ct. at 1392, 31 L.Ed.2d at 722.

Thus the Court concluded:

> "The application of federal common law to abate a public nuisance in interstate or navigable waters is not inconsistent with the Water Pollution Control Act. Congress provided in § 10(b) of that Act that, *save as a court may decree otherwise in an enforcement action, 'State and interstate action to abate pollution of interstate or navigable waters shall be encouraged and shall not . . . be displaced by Federal enforcement action.'*" (Emphasis added.) Illinois v. City of Milwaukee, *supra*, at 104, 92 S.Ct. at 1393, 31 L.Ed.2d at 723.

As is indicated by the above quoted language, the Court, in *City of Milwaukee*, was addressing itself to situations involving suits between states to abate water pollution.[39] The case at bar is a suit by the Federal Government against a municipality and other private individuals. Further, the Government here does not claim that their remedy "is not within the precise remedies proscribed by Congress."

In view of the fact that the Federal Water Pollution Control Act of 1972 is not yet totally operational, this court, out of an abundance of caution, will not, at this time, rule on the merits of the defendants' second claim for dismissal of the plaintiff's common law nuisance action.

Finally, with respect to the defendants' third claim that the court should refer this case to the E.P.A. under the doctrine of primary jurisdiction, again this court will not at this time grant such relief. Such relief would necessarily involve a court-agency relationship which, at this time, does not seem appropriate for the disposition of these motions.

Accordingly, it is

Ordered, that the motion of the municipal defendant and its named officers to dismiss the statutory claims in the complaint is granted. The defendants' requests to dismiss the common law claim and, to refer, in the alternative, this case to the E.P.A. under the doctrine of primary jurisdiction are denied without prejudice to renew at a more appropriate time; and it is further

Ordered, that the Government's motion for summary judgment, against the municipality and its named officers on the statutory claims in the complaint, *viz.,* Title 33 U.S.C. § 407 and Title 33 U.S.C. § 441, is denied.

---

37. The plaintiff's motion for summary judgment does not seek an adjudication of its common law claim at this time.

38. 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

39. It is interesting to note that notwithstanding the Court's finding that some common law remedy exists, they nonetheless announced the following caveat:
> "It may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance. . . ." Illinois v. City of Milwaukee, *supra*, at 107, 92 S.Ct. at 1395, 31 L.Ed.2d at 725.