**STREAM POLLUTION CONTROL BOARD OF the STATE OF INDIANA, Plaintiff-Appellee, and Zarko Sekerez, Proposed Intervenor, Plaintiff-Appellant,**

**v.**

**UNITED STATES STEEL CORPORATION, Defendant-Appellee.**

**No. 74–1244.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 20, 1975.

Decided March 14, 1975.

As Amended March 24, 1975.

Zarko Sekerez, pro se.

Theodore L. Sendak, Atty. Gen., Michael T. Schaefer, Deputy Atty. Gen., Indianapolis, Ind., Henry L. Pitts, Chicago, Ill., G. Edward McHie, Hammond, Ind., for appellee.

Before STEVENS, SPRECHER and TONE, Circuit Judges.

STEVENS, Circuit Judge.

Appellant, a private citizen, asks us to reverse an order denying his motion to intervene in a common law public nuisance action brought by the Stream Pollution Control Board of the State of Indiana against U. S. Steel Corporation. The questions presented are (1) whether the federal district court has jurisdiction of the underlying nonstatutory claim and, if so, (2) whether appellant has a statutory right to intervene pursuant to § 505(b)(1)(B) of the Federal Water Pollution Control Act Amendments of 1972.[1]

The Board's amended complaint invokes the district court's federal question jurisdiction pursuant to 28 U.S.C. § 1331(a).[2] It characterizes this case as "an action to abate pollution of the Grand Calumet River, a navigable stream and tributary of Lake Michigan, a body of interstate water." Specifically, the Board alleges that defendant's industrial plant in Gary, Indiana, has discharged cyanide and ammonia nitrogen into the river in quantities which exceed the limits specified by the Board's regulations.[3] In its prayer for relief, the

---

1. Pub.L.No.92–500, 86 Stat. 816. Section 505(b)(1)(B) is codified as 33 U.S.C. § 1365(b)(1)(B) (Supp. II, 1972). Because of their relevance, we quote subparagraphs (a) and (b) of § 1365 in full:

"§ 1365. Citizen suits.

(a) Authorization; jurisdiction.

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

(b) Notice.

No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation."

2. That section provides:

"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

Paragraphs 1 and 3 of the amended complaint allege that the amount in controversy exceeds $10,000, exclusive of interest and costs.

3. For several years the Board has been trying to compel defendant to minimize these discharges. In 1967 it promulgated water quality standards which it claims U. S. Steel has violated. In 1970 the Board held an administrative hearing and ordered defendant to install new water treatment facilities; its order was set aside by the Indiana courts as not supported by adequate findings of fact.

In 1973 the Board commenced this litigation. In its original complaint it invoked the jurisdiction of the federal court pursuant to 28 U.S.C. § 1332, alleging that the parties were of diverse citizenship. In that complaint, the Board alleged violations of its own regulations and asked the federal court to impose the statutory penalties authorized by Indiana law.

Board asks the federal court to order defendant to abate its pollution of the Grand Calumet River, to enter judgment in the amount of $80,000 (representing penalties authorized by Indiana statute), and to grant "all other proper relief in the premises."

Appellant, a private citizen of Indiana, moved to intervene, alleging that his interests in the waters of Lake Michigan and the environment of the State of Indiana may be adversely affected by these proceedings. He adopted the Board's allegations and, in addition, alleged that defendant was causing oil to accumulate in the river and that its discharges were polluting Lake Michigan.[4] He claimed "an unconditional right to intervene" pursuant to § 505(b)(1)(B).

The district court denied the motion to intervene, holding that the nuisance action was not brought to require compliance with an effluent standard or limitation promulgated pursuant to the Federal Water Pollution Control Act Amendments of 1972 (hereinafter "the 1972 Act"), and therefore that § 505(b)(1)(B) of that Act did not grant appellant a right to intervene. The district court also denied U. S. Steel's motion to dismiss, holding that the jurisdictional question was answered by the unanimous opinion of the Supreme Court in Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712. We affirm.

### I.

■ Before reaching the question whether appellant has a statutory right to intervene we must decide whether the district court has jurisdiction of the underlying claim. For, as defendant argues, if it is apparent from the record that jurisdiction is lacking, we must order the action dismissed.[5] Moreover, the jurisdictional question must be answered by reference to the allegations in the amended complaint, unaided by the additional allegations in pleadings submitted in support of the motion to intervene. See Pianta v. H. M. Reich Co., Inc., 77 F.2d 888, 890 (2d Cir. 1935).

The Board's amended complaint, unlike appellant's pleadings, contains no allegation of pollution of Lake Michigan. Nor do the pleadings contain any allegation that the interests of any sovereign, or of the citizens of any state other than Indiana, have been affected by defendant's discharges. The jurisdictional question in this case is therefore not necessarily answered by the holding of the Supreme Court in Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712.

■ That case does, however, unequivocally confirm " that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin." Id. at 100, 92 S.Ct. at 1391. Moreover, that opinion expressly authorizes the federal courts to fashion a federal common law of public nuisance to resolve controversies involving the impairment of the environmental interests of one state by sources outside its domain.[6]

---

Subsequently, the Board filed the amended complaint which is before us, which includes the "federal common law" nuisance claim discussed in the text.

4. For example, in his "Amended Pleading of Intervenor," appellant alleged:

"(12) Petitioner is a person having an interest in the waters of Lake Michigan in that he uses said waters for fishing and said interest is being adversely affected in that said waters are being polluted by the defendant and the fish are being poisoned by the defendant.

"(13) Petitioner is a person having an interest which is or may be adversely affected in that the discharge of acids and other industrial wastes into the waters of Lake Michigan by the defendant is a threat to petitioner's health and the health of his family."

5. See Carson v. Allied News Co., 511 F.2d 22 (7th Cir. 1975).

6. See, e. g., the Court's express approval of the decision in State of Texas v. Pankey, 441 F.2d 236 (10th Cir. 1971). See 406 U.S. at 103, 107 n. 9, 92 S.Ct. 1385.

Of greater relevance to this case are the repeated references to the controlling importance of federal law applicable to the pollution of "interstate or navigable waters."[7] Those references may well imply that the federal common law of public nuisance extends to all of our navigable waters, and perhaps to all tributaries of interstate waters. We cannot tell from the Court's opinion, however, whether, apart from statute, the federal interest in navigability would support a nuisance action without any allegation of interference with navigation, or whether the interest in the purity of interstate bodies of water is sufficient to justify nonstatutory federal protection of all tributaries. We need not, however, resolve such questions to decide the precise jurisdictional issue before us.

The question we must decide is not whether the amended complaint states a cause of action for which relief can be granted, but rather whether the complaint raises substantial questions which only a federal court may finally answer. As the Supreme Court held in Bell v. Hood:

> Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. * * * The previously carved out exceptions are that a suit may

sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

327 U.S. 678, 682–683, 66 S.Ct. 773, 776, 90 L.Ed. 939. . --

■ The amended complaint in this case purports to state both a claim under Indiana law and a claim under federal common law. We may assume, as defendant argues, that the attempt to recover statutory penalties for violation of the Board's regulations is not a "civil action" over which the federal court would have independent jurisdiction. Nevertheless, we cannot fairly conclude from the pleading itself that the federal claim is merely colorable and asserted solely for the purpose of conferring jurisdiction on the district court to decide the state law issues. Nor, in view of the broad language used by the Supreme Court in the *City of Milwaukee* opinion, with particular reference to its emphasis on the federal interest in uniformity in dealing with the pollution of interstate or navigable waters,[8] can we characterize the Board's federal claim as "wholly insubstantial and frivolous."[9] Surely enough has been alleged to give the district court jurisdiction to decide whether the Board is entitled to some relief as a matter of federal common law.[10]

---

7. *Id.* at 99, 102, 104, 92 S.Ct. 1385.

8. "[I]t is not only the character of the parties that requires us to apply federal law. . . . As Mr. Justice Harlan indicated for the Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 421–427 [84 S.Ct. 923, 936–940, 11 L.Ed.2d 804], where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law." 406 U.S. at 105 n. 6, 92 S.Ct. at 1393. (Citations omitted).

9. While U. S. Steel argues that the application of this federal common law depends on the existence of a conflict between sovereigns, we note that, with one exception, the federal district courts have permitted the federal government to utilize this federal com-

mon law as a basis for pollution-abatement actions. *See* United States v. Stoeco Homes, Inc., 359 F.Supp. 672 (D.N.J.1973); United States v. United States Steel Corp., 356 F.Supp. 556 (N.D.Ill.1973); United States v. Ira S. Bushey & Sons, Inc., 346 F.Supp. 145 (D.Vt.1972). *Contra,* United States v. Lindsay, 357 F.Supp. 784 (E.D.N.Y.1973). In United States v. Lindsay, the district court stated that *City of Milwaukee* was addressed to situations involving suits between states. 357 F.Supp. at 794. The court had announced earlier, however, that it was not deciding this question at this time. 357 F.Supp. at 793–794.

10. We need not decide, consequently, whether the 1972 Amendments and the regulations promulgated thereunder have acted to "preempt the field of federal common law of nuisance," in Justice Douglas' words. 406 U.S.

The district court correctly assumed jurisdiction of the controversy. Whether it correctly held that the amended complaint stated a federal cause of action is a question which is not properly before us on this appeal.

## II.

Under 33 U.S.C. § 1365(b)(1)(B), appellant, as a private citizen, is entitled to intervene if, and only if, the underlying action was commenced and is being prosecuted to require compliance with a "standard, limitation, or order" within the meaning of the 1972 Act. We hold that an action to abate a nuisance as a matter of federal common law is not such an action and that the motion to intervene was therefore correctly denied.

The term "effluent standard or limitation under this chapter" is defined in

subsection (f) to include "an unlawful act under subsection (a) of section 1311 of this title." [11] That subsection (i. e., § 1311(a)) provides that:

> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

Appellant does not argue that defendant has failed to comply with any of the enumerated sections of the Act except the remaining portion of § 1311. The other sections are plainly inapplicable.[12] The remainder of § 1311, in brief, provides a timetable for the promulgation of various effluent limitations to become effective, in some cases no later than July 1, 1977, and in others no later than July 1, 1983.[13] Appellant argues that de-

---

at 107, 92 S.Ct. at 1395. Prior to the promulgation of effluent limitations, this possibility had been rejected by several courts. People of the State of Illinois ex rel. Scott v. City of Milwaukee, Wisconsin, 366 F.Supp. 298, 299–301 (N.D.Ill.1973); United States v. Ira S. Bushey & Sons, Inc., 363 F.Supp. 110, 119–120 (D.Vt.1973); United States v. United States Steel Corp., 356 F.Supp. 556, 558–559 (N.D.Ill.1973).

11. Subsection (f) reads as follows:

"For purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; or (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title)." 33 U.S.C. § 1365(f).

12. Section 1312 provides for the establishment of a stricter effluent limitation in areas where those defined by § 1311(b) are inadequate to maintain a water quality level "which shall assure protection of public water supplies, agricultural and industrial uses" and other important uses. No such stricter limitation has, to our knowledge, been established for this U. S. Steel facility. Thus, the reference in § 1311(a) to § 1312 is inapplicable here.

Similarly inapplicable are §§ 1316, 1317, and 1328 which provide for effluent limitations for new point sources, special toxic pollutants, and for discharges associated with an approved aquaculture project. Nor would U. S. Steel have to obtain a permit containing the standards set forth in § 1344 for the discharge of dredged or fill material.

Thus, the only sections with which U. S. Steel need comply are § 1311(b), which defines effluent limitations for existing point sources, and § 1342, which establishes a permit program to ensure the observance of § 1311(b)'s standards. The E.P.A. has, however, issued permits to major pollution sources even before the issuance of the relevant effluent limitations guidelines. *See* T. Arnold, Effluent Limitations and NPDES, 15 B.C.Ind. & Com.L.Rev. 767, 772–773 (1974); 33 U.S.C. § 1342(a)(1). Neither U. S. Steel nor Sekerez has informed us, however, that the Gary facility had in fact received a permit at the time of these discharges in early 1973. Thus, we assume that these discharges did not violate the terms of any federal permit. Similarly, as the record contains no allegation to the contrary, we assume that U. S. Steel has made proper application for a discharge permit, thus shielding it from liability for discharges in the absence of a permit under 33 U.S.C. § 1342(k). *See generally,* Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, at 696 (D.C.Cir., 1974).

13. Pursuant to 33 U.S.C. § 1314(b), the Administrator of the federal Environmental Protection Agency is responsible for promulgating guidelines to establish the effluent standards or limitations called for throughout the amendments. Section 1311(b) requires that existing point sources achieve, by 1977, an

fendant could not possibly be in compliance with any such limitation before it has been promulgated; *ergo,* he argues, before an applicable limitation takes effect, defendant is totally prohibited from discharging any pollutant into the river. Since the amended complaint seeks abatement, he therefore contends that it is an action to require compliance with the 1972 Act.[14]

On its face, § 1365(f) does not support Sekerez' position. The term "effluent standard or limitation under this chapter" is defined as an unlawful act under subsection (a) of section 1311 of Title 33 only "effective July 1, 1973." *See* n. 11, *supra.* The amended complaint herein refers to discharges by the Gary facility on April 12, April 19, April 26, and May 9, 1973, all well before the crucial July 1, 1973, date. Thus, § 1365(f)(1) is not available to Sekerez. As the relevant limitations, standards of performance, prohibitions, certifications, and permits referred to in § 1365(f)(2)–(6) either had not been promulgated as of the dates of the discharges or are not applicable here (*see* n. 12, *supra*), the underlying action cannot be one to require compliance with

a standard, limitation, or order, the predicate for intervention under § 1365(b)(1)(B).

Even assuming, however, that the amended complaint can be read to refer to discharges continuing beyond July 1, 1973, and therefore into the time period to which § 1365(f)(1) applies, there are at least two reasons why appellant's argument is unacceptable. First, § 1311(a) speaks in terms of compliance with sections of the statute, rather than compliance with an effluent standard or limitation. We think defendant is in compliance with the statute as long as it does not violate any of its provisions. Since its discharges cannot violate any effluent standard or limitation until after such a standard has become effective, defendant's earlier discharges are not prohibited by the Act; defendant is therefore in compliance with the statute.[15]

Second, appellant's construction of the statute is dramatically at odds with the entire legislative scheme.[16] Under appellant's view, the promulgation of an effluent standard would be tantamount to a license to pollute, rather than a required curtailment of an existing in-

---

effluent limitation "which shall require the application of the best practicable control technology currently available" and, by 1983, an effluent limitation "which . . . shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants."

The effluent limitations defined in § 1311(b) are to be incorporated into the discharge permits issued each point source under 33 U.S.C. § 1342(a)(1).

At the time the underlying suit was brought by the Stream Pollution Control Board, the Administrator of the E.P.A. had not promulgated the effluent limitation guidelines that would establish the permissible emissions by the class or category of point sources of which this U. S. Steel facility is a member. Subsequently, on February 19, 1974, notice of proposed effluent limitation guidelines for the iron and steel manufacturing point source category was given. 39 Fed.Reg. 6484 (1974). These proposed limitations were adopted by the Administrator on June 28, 1974, as 40 C.F.R. Part 420. 39 Fed.Reg. 24114 (1974). We assume, arguendo, that these limitations

are applicable to the source involved in this case. While 33 U.S.C. § 1314(b) had required the Administrator to adopt such regulations within one year of October 18, 1972, his failure to do so led to the issuance of a court order in Natural Resources Defense Council v. Train, 6 E.R.C. 1033 (D.D.C.1973), aff'd, 510 F.2d 692 (D.C.Cir., 1974).

14. Appellant's argument assumes that the Board's amended complaint seeks *total cessation* of defendant's discharges of cyanide and ammonia nitrogen. Although this is, at best, a doubtful reading of the amended complaint, we assume arguendo that it is a correct interpretation of the Board's prayer for relief.

15. Similarly, U. S. Steel cannot violate the terms of a discharge permit until one has been issued.

16. For a general review of the provisions of the 1972 amendments *see* Comment, The Federal Water Pollution Control Act Amendments of 1972, 1973 Wis.L.Rev. 893 (1973); Comment, the Federal Water Pollution Control Act Amendments of 1972, 14 B.C.Ind. & Com.L.Rev. 672 (1973).

dustry practice. For, under his view, discharges are totally prohibited until the effluent limitation becomes effective, and thereafter permitted in amounts not exceeding the licensed level. It is manifest that Congress intended to require step-by-step improvement in the quality of discharged effluent,[17] rather than a zigzag course with total purity demanded forthwith only to be succeeded by varying stages of impurity.

Judge Sharp's order denying the motion to intervene is

Affirmed.

**17.** The 1977 standard requires "the application of the best practicable control technology currently available," 33 U.S.C. § 1311(b)(1)(A)(i). The 1983 standard requires "application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants," 33 U.S.C. § 1311(b)(2)(A)(i).

33 U.S.C. § 1251(a)(1) defines "the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."

These provisions make it clear that Congress, which very carefully created a two-phased program for moving American industry toward the eventual goal of a total absence of all water pollution by 1985, did not intend that, until the Administrator promulgated the 1977 emission standards, any discharge was to be unlawful. It would be ironic indeed if the promulgation of such standards, incorporating as they must "the best practicable control technology currently available," acted to move us away from, rather than nearer to, this eventual goal.