539 F.2d 1006
 9 ERC 1212, 6 Envtl. L. Rep. 20,703
 COMMITTEE FOR the CONSIDERATION OF the JONES FALLS SEWAGE
SYSTEM, an association of neighborhood and
community organizations and persons, et
al., Appellants,
v.
Russell E. TRAIN, Individually and as Administrator of the
United States Environmental Protection Agency, et
al., Appellees.
 No. 74-2076.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1976.
Decided July 16, 1976.
 
 Karin P. Sheldon, Washington, D. C. (Roisman, Kessler & Cashdan, Washington, D. C., on brief), for appellants.
 Searle E. Mitnick, Baltimore, Md. (Charles B. Heyman, Kaplan, Heyman, Engelman & Belgrad, Baltimore, Md., on brief), for intervenor.
 Harry S. Shapiro, Chief Asst. Sol. of Baltimore County, Towson, Md. (Francis B. Burch, Atty. Gen. of Md., Randall M. Lutz, Paul Walter, Asst. Attys. Gen. of Md., Paul M. Vettori, Sp. Atty. Gen. of Md., Benjamin L. Brown, City Sol. of Baltimore, Harry S. Swartzwelder, Jr., Associate City Sol., William Hughes, Chief City Sol., J. Carroll Holzer, Baltimore, Md., and R. Bruce Alderman, County Solicitors of Baltimore County, Towson, Md., Peter Max Zimmerman and Maurice W. Baldwin, Jr., Asst. County Sols., Baltimore, Md., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL, FIELD and WIDENER, Circuit Judges, sitting En Banc.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The question is whether there is a body of federal common law conferring rights upon private citizens to enjoin intra-state stream pollution which is not enjoinable under the Federal Water Pollution Control Act Amendments of 1972. 33 U.S.C.A. § 1251 et seq. We hold there is not.
 
 
 2
 Jones Falls Stream, which flows into the Patapsco River and thence into Baltimore Harbor, from time to time is polluted by untreated sewage flowing over the weir of the Jones Falls Sewage System treatment plant.
 
 
 3
 A group of citizens living near Jones Falls Stream or frequenting its banks joined as plaintiffs in this action seeking injunctive relief under the federal statute. It soon appeared, however, that they had no cause of action under the statute, for the city officials had submitted to the Maryland Department of Public Works a timely and properly supported application for a discharge permit under the provisions of § 1342(k). That section provides that, during the pendency of a timely and properly supported application, discharges shall not be in violation of the statute. Later, during the pendency of this litigation, the state agency, with the authorization of the Environmental Protection Agency, actually issued a permit since there was a finding that the present statutory standards were being met.
 
 
 4
 Permitting an interim discharge of pollutants is in accordance with the comprehensive regulatory scheme of the Federal Water Pollution Control Act Amendments of 1972. Its ultimate objective is the elimination of all water pollution. Purity however, is not to be achieved or required instantaneously. Instead the Act establishes a series of steps which impose progressively stricter standards until the final elimination of all pollutant discharges is achieved, that being envisioned for the year 1985.
 
 
 5
 When it appeared that the plaintiffs might have no cause of action under the statute, they tendered an amended complaint alleging also a federal common law right of action to obtain an injunction against further connections to the sewer line emptying into the Jones Falls Stream. The amended complaint was rejected because the district court concluded there was no federal jurisdiction to consider the claim. We come to the same result, but we reach it on the merits, concluding that the amended complaint stated no claim upon which relief may be granted.
 
 
 6
 When the Supreme Court in 1938 decided Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, it reversed the course of earlier judicial history during which federal courts had fashioned their own substantive rules of law for application to controversies within the diversity jurisdiction. In halting that course, the Supreme Court declared, supra at 78, 58 S.Ct. at 822:
 
 
 7
 There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or "general," be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts.
 
 
 8
 While Erie's doctrine has remained one of the fundamental ties of our federalist system of government, absolutisms seldom remain absolute. Since Erie, some federal common law has evolved.
 
 
 9
 This "new federal common law"[1] respecting waters[2] came into being as a necessary expedient in the resolution of interstate controversies. When ranchers in New Mexico used a pesticide which polluted streams in Texas upon which Texas citizens were dependent for drinking water,[3] or when cities and sewage commissions in Wisconsin cast insufficiently treated sewerage into Lake Michigan which polluted beaches in Illinois,[4] the federal courts were confronted with a dilemma. The law of the state whose citizens were subject to injuries by the interstate pollution ought not to govern the conduct of citizens and municipalities in another state, while to apply the law of the offending state would be a utilization of the laws of a state whose selfish interest was in the protection of the offenders, herself, her political subdivisions or her citizens. Of necessity, the Court of Appeals for the Tenth Circuit, in 1971, in Pankey, and the Supreme Court, in 1972, in Illinois v. Milwaukee, turned to a body of federal common law for the resolution of interstate pollution controversies when a state sought extra-territorial relief on behalf of her citizens.[5]
 
 
 10
 We may thus take it as established that there is a body of federal common law by which a public nuisance in one state which infringes upon the environmental and ecological rights of another state may be abated. As thus applied, there is an acceptable accommodation of state and national interests.[6]
 
 
 11
 Too, as the Supreme Court observed in Illinois v. Milwaukee, there is much federal interest in interstate and navigable waters. The existence of the Federal Water Pollution Control Act attests to the federal interest in interstate waters. Yet, the statute was largely designed to enlist the aid of the states and, through state action, to achieve the final objective of purity of waters. As the Congress stated in § 1251(b) of the Act:
 
 
 12
 It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, . . . .
 
 
 13
 Perhaps with the exception of actions by the United States to abate public nuisances created in navigable waters by polluters,[7] but consistent with § 1251(b), the doctrine of Illinois v. Milwaukee has not been extended beyond the abatement of public nuisances in interstate controversies where the complainant is a state and the offenders are creating extra-territorial harm.[8] In controversies such as this one, there is present neither the reason nor the necessity for the invocation of a body of federal common law which was present in Illinois v. Milwaukee. This intrastate controversy is entirely local. The plaintiffs are Maryland citizens complaining of the conduct of public officials of the City and County of Baltimore, Maryland. It is not contended that the alleged pollution of Jones Falls Stream has any effect outside the State of Maryland, and no other state is complaining of it. Maryland law is perfectly adequate for the resolution of such disputes between some of her citizens and some of her public officials. To the extent there is a federal interest, it is expressed in the Federal Water Pollution Control Act Amendments of 1972, but the plaintiffs have no claim based upon that statute.
 
 
 14
 Indeed, it would be an anomaly to hold that there was a body of federal common law which proscribes conduct which the 1972 Act of Congress legitimates. The defendants are in compliance with the statute. They are operating under a permit issued in accordance with the statute and the authorization of the Environmental Protection Agency. The Congress and the Executive Department, acting through the Environmental Protection Agency, have declared their conduct lawful until the time for the application of more restrictive standards. While the state courts are free to apply state nuisance law more rigidly,[9] a federal court in such a local controversy may not turn to a supposed body of federal common law to impose stricter standards than the statute provides.
 
 
 15
 That the rule of Illinois v. Milwaukee is limited to interstate controversies in which the rights of a state are sought to be vindicated, is supported not only by the absence of any underlying reason and necessity for an extension of the rule but by the recent case of Reserve Mining Co. v. Environmental Protection Agency, 8 Cir., 514 F.2d 492, 520, 521 (En Banc). There the United States and the States of Michigan, Minnesota and Wisconsin were among the plaintiffs seeking to enjoin Reserve Mining's discharge of taconite tailings into Lake Superior. The Court of Appeals for the Eighth Circuit, while granting relief on other grounds, held that the rule of Illinois v. Milwaukee was inapplicable, notwithstanding the presence of the state plaintiffs, because no interstate effect was alleged.
 
 
 16
 Here, where the controversy is strictly local, where there is no claim of vindication of the rights of another state and where there is no allegation of any interstate effect, we conclude there is no body of federal common law to which the plaintiffs may resort in their effort to obtain judicial relief from discharges which the federal statute and the federal regulatory agency permit.
 
 
 17
 Since the amended complaint did not state a claim upon which relief might be granted, the district court properly dismissed it.
 
 
 18
 AFFIRMED.
 
 BUTZNER, Circuit Judge (dissenting):
 
 19
 I respectfully dissent on the following grounds:
 
 
 20
 P Jones Falls is a part of the navigable waters of the United States.
 
 
 21
 P Federal law, including federal common law, is applicable to nuisances that pollute the navigable waters of the United States.
 
 
 22
 P Baltimore's alleged pollution of Jones Falls in violation of federal common law presents a federal question.
 
 
 23
 P A citizen whose complaint satisfies the jurisdictional requirements for litigating a federal question can invoke federal common law to abate contamination of a navigable water of the United States, even though the pollution is also an intrastate nuisance.
 
 
 24
 P The function of federal common law for the abatement of water pollution is to fill statutory interstices and to provide uniform rules regarding the waters of the United States. Therefore, the question whether the Federal Water Pollution Control Act Amendments of 1972 preempt federal common law with respect to the issues in this case should await the development of an evidentiary record and trial on the merits.
 
 
 25
 Accordingly, I would remand this case for further proceedings. My reasons for reaching these conclusions follow.
 
 
 26
 * The background of the controversy now before us is relatively simple. The Committee for the Consideration of the Jones Falls Sewage System complained that Baltimore, Maryland, was discharging sewage[1] into Jones Falls without a permit. While this case was pending, the city obtained a permit from the Maryland Department of Natural Resources to discharge effluents from sewage treatment plants into a number of waterways, including Jones Falls. The permit was authorized by the Environmental Protection Agency pursuant to the 1972 Amendments to the Water Pollution Control Act, and the committee acknowledges that its issuance moots one aspect of its suit.
 
 
 27
 The committee contends that even though the city has a permit, federal common law prohibits dumping untreated sewage from new sources into Jones Falls. It alleges that in 1973 the flow of sewage exceeded the plant's capacity by three million gallons a day and that substantial amounts of raw sewage still enter Jones Falls entirely untreated. As a result, the committee asserts, the coliform and fecal bacteria levels in the stream exceed acceptable amounts, creating noxious gases, hazards to health, and impairment of the use and enjoyment of the residential communities through which Jones Falls flows. The committee complains that the failure of the city to restrict additional sewage hookups will aggravate the problem. Pointing to the absence of any reference to a moratorium on new hookups in the Act and the permit, the committee argues that it is imperative to enjoin these additional sources of pollution by applying federal common law. If this is not done, the committee claims, Jones Falls will become dirtier in the coming decade, and the national goal of eliminating the discharge of pollutants by 1985 will be thwarted.[2]
 
 
 28
 The city and the intervenors, who are successful applicants for new hookups, insist that new sources of sewage can legally be added to the overloaded system. They contend (a) that private citizens cannot invoke federal common law to abate intrastate pollution of navigable waters, and (b) that if they can, the committee's complaint does not state a cause of action because the 1972 Amendments preempt the federal common law. The district court ruled on the first issue, holding that only "governmental entities" can invoke the jurisdiction of federal courts under federal common law to abate a nuisance that pollutes navigable waters. Consequently, it found no occasion to consider the second issue. Committee for Consideration of Jones Falls Sewage System v. Train, 375 F.Supp. 1148, 1153-54 (D.Md.1974).
 
 II
 
 29
 In support of its right to invoke federal common law to curtail the pollution of Jones Falls, the committee relies on § 505 of the 1972 Amendments to the Act (33 U.S.C. § 1365). This section, after conferring a right of action on adversely affected citizens to enforce the Act, provides in subsection (e):
 
 
 30
 "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)."
 
 
 31
 The term "common law" is not expressly limited by this provision to the common law of the states. On its face the clause is broad enough to embrace federal common law. This leads to the principal issue of the appeal: whether the 1972 Amendments recognize and preserve the right of a citizen to invoke federal common law to abate pollution of the navigable waters of the United States.
 
 
 32
 There can be no doubt that Jones Falls is a part of the navigable waters of the United States. The Act defines "navigable waters" as "waters of the United States, including the territorial seas."[3] The legislative history discloses that Congress intended the term "navigable waters" to "be given the broadest possible constitutional interpretation . . . ."[4] Referring to this history, the Environmental Protection Agency has interpreted the statutory definition to include "tributaries of navigable waters of the United States."[5] The Agency's construction is consistent with the Rivers and Harbors Act of 1899, which prohibits throwing refuse "into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water."[6] In United States v. Valley Camp Coal Co., 480 F.2d 616 (4th Cir. 1973), we read the Act of 1899 literally, applying it to "an unnamed tributary of the Kanawha River."
 
 
 33
 After flowing a short distance, Jones Falls joins the Patapsco River, which empties into Chesapeake Bay, one of the nation's valuable maritime resources. It is reasonable to assume that Congress realized that the great volume of water in the Bay could not be cycled through treatment plants to remove contaminants. It is also reasonable to assume that Congress could not expect persons affected by pollution in the Bay to detect the source of the pollutants in the scores of tributaries that drain its vast watershed. Protection of the Bay, Congress concluded, can best be achieved by preventing the discharge of pollutants into its tributaries, including Jones Falls.[7] Section 505 of the Act implements this policy by allowing any adversely affected citizen to sue to abate pollution at the source. Therefore, the national interest in making the navigable waters of the United States wholesome and clean involves Jones Falls, even though Baltimore's sewage also has an intrastate effect on people who live near the stream.
 
 
 34
 Vindication of the federal interest in eliminating pollution of Jones Falls is not dependent on state law. Although Congress recognized, preserved, and protected the primacy of states' responsibilities and rights to cleanse the waters of the United States,[8] it did not foreclose concurrent action in federal courts to enforce federal standards. Indeed, this point is beyond debate in the lower federal courts. Construing a clause of the Water Pollution Control Act Amendments of 1956 (33 U.S.C. § 1151(b)), similar to the corresponding clause in the 1972 Amendments, the Supreme Court said:
 
 
 35
 "The Federal Water Pollution Control Act in § 1(b) declares that it is federal policy 'to recognize, preserve, and protect the primary responsibilities and rights of the States in preventing and controlling water pollution.' But the Act makes clear that it is federal, not state, law that in the end controls the pollution of interstate or navigable waters." Illinois v. Milwaukee, 406 U.S. 91, 102, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1972).
 
 
 36
 The Court's declaration has not been eroded by the passage of time. On the contrary, the 1972 Amendments make the federal role in eliminating water pollution more pervasive than the statute which the Court was construing in Illinois.[9]
 
 
 37
 Moreover, § 505 of the Act (33 U.S.C. § 1365) authorizes citizens' suits to enforce the Act's effluent standards in the districts where pollutants are discharged.[10] The federal nature of this cause of action is emphasized by Congress' specific direction that the district court shall have jurisdiction to enforce the Act without regard to the citizenship of the parties or the amount in controversy. This grant of the right to enforce the Act is coupled with the express preservation of a citizen's right to bring suit under common law for relief the Act does not afford. The provisions of § 505 must be read as a whole. Together they demonstrate, I believe, that Congress recognized that the pollution of navigable waters and their tributaries raises a federal question for which all federal law, including common law, is applicable.[11] The 1972 Amendments are consistent with Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), to which I will now turn for an examination of the attributes of the federal common law applicable to the nation's waters.
 
 III
 
 38
 In Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), the Court, drawing on the federal government's long history of water control, held that federal common law could be applied to abate a public nuisance caused by pollution of interstate or navigable waters. The Court also held that a state is a proper party plaintiff, but its discussion concerning the nature of the federal common law applicable to navigable waters is not expressly limited to actions brought by states. The Court explained that this field of federal common law is fashioned from the policies of national laws dealing with the country's natural resources and from state laws compatible with the congressional purpose. Its function is to fill statutory interstices and to provide uniform rules regarding the waters of the United States.[12]
 
 
 39
 The Court's opinion refutes Baltimore's argument that federal common law applies only to interstate waters. The Court expressly stated that federal common law applies also to navigable waters. But see Reserve Mining Co. v. Environmental Protection Agency, 514 F.2d 492, 520-22 (8th Cir. 1975). Moreover, it held that application of federal common law to abate pollution in navigable waters "is not inconsistent with the Water Pollution Control Act." 406 U.S. at 104, 92 S.Ct. at 1393. Since federal common law draws its substance from federal statutes, the expansion of the 1972 Amendments' coverage to tributaries of navigable waters makes these tributaries also subject to federal common law. Congress, as we have noted, confirmed the Court's understanding of the complementary role of the common law by providing that the authorization for citizens' suits to enforce the Act would not restrict any person's right under the common law to seek relief not afforded by the Act.[13] See United States ex rel. Scott v. United States Steel Corp., 356 F.Supp. 556, 559 (N.D.Ill.1973).
 
 
 40
 Illinois also refutes Baltimore's argument that only a state can invoke federal common law. The Court recognized the right of a state to do so, but it cautioned against confusing parties with subject matter in determining whether to apply federal common law:
 
 
 41
 "Thus, it is not only the character of the parties that requires us to apply federal law . . . . (W)here there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law." 406 U.S. at 105, n. 6, 92 S.Ct. at 1394.
 
 
 42
 Similarly, Illinois exposes the fallacy in Baltimore's thesis that the pollution of Jones Falls is only a local matter. On this subject the Court was explicit, saying:
 
 
 43
 "The question is whether pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of § 1331(a). We hold that it does; and we also hold that § 1331(a) includes suits brought by a State." 406 U.S. at 99, 92 S.Ct. at 1390.
 
 
 44
 Section 1331(a) confers jurisdiction on district courts because of the federal nature of the dispute.[14] Cf. Georgia v. Tennessee Copper Co., 206 U.S. 230, 239, 27 S.Ct. 618, 51 L.Ed.2d 1038 (1907) (Harlan, J., concurring); Ames v. Kansas, 111 U.S. 449, 470-72, 45 S.Ct. 437, 28 L.Ed. 482 (1884). No authority justifies placing a gloss on this basic jurisdictional statute to limit its application to controversies involving a state.
 
 
 45
 Baltimore suggest that the committee has no cause of action based on federal common law because the 1972 Amendments have preempted the field. At best this suggestion is premature. Resolution of this issue should await trial on the merits. Illinois teaches that a litigant is not to be denied relief because the remedy he seeks "is not within the precise scope of remedies prescribed by Congress." 406 U.S. at 103, 92 S.Ct. at 1392. One function of the federal common law is to fill statutory interstices.[15] The Act itself recognizes this well established principle by allowing citizens to bring suits at common law for relief not contemplated by the Act.[16] The suggestion that a citizen must bring a suit in state court to fill the interstices of the federal Act is contrary to both § 505(e) and the principles expressed in Illinois. Furthermore, it is impractical to shuffle between federal and state courts to determine the scope of the Act and then to fill its interstices with state law. This would provoke diversity, rather than achieve uniformity, in the law governing the abatement of nuisances in the navigable waters of the United States.
 
 
 46
 In sum, I find neither a substantive nor a jurisdictional barrier to a citizen's reliance on federal common law to abate the pollution of navigable waters. Whether a citizen can maintain his suit should depend, I believe, on his standing to have a district court decide the merits of his claim.
 
 IV
 
 47
 To establish standing, a litigant must first satisfy Article III of the Constitution by showing the existence of a case or controversy against his adversary. Further, to demonstrate that he is not barred by prudential limitations on the exercise of the court's jurisdiction, he must point either to an express statutory grant of a right of action or to a constitutional or statutory provision that can be construed to afford persons in his situation judicial relief. See Warth v. Seldin, 422 U.S. 490, 498-501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). An individual pressing an environmental claim must show more than a mere interest in the problem; he must prove that he himself is affected by immediate or threatened injury. An association instituting suit must allege that it, or one of its members, suffers the same harm that would entitle an individual to standing. United States v. SCRAP, 412 U.S. 669, 683-90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).
 
 
 48
 The appellants demonstrate a sufficient "personal stake in the outcome of the controversy" to satisfy Article III. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The complaint alleges that the individual appellants and the members of the associations comprising the committee live in the neighborhood through which Jones Falls flows, and it sets forth the particulars of the injuries which the discharge of sewage into the stream causes them. See Sierra Club v. Morton, supra; Montgomery Environmental Coalition v. Fri, 366 F.Supp. 261, 264 (D.D.C.1973).
 
 
 49
 Two provisions of the 1972 Amendments to the Act establish that aggrieved citizens and their associations should not be denied standing by prudential limitations. As I have previously noted, the Amendments expressly grant any citizen "having an interest which is or may be adversely affected" a right of action to enforce the Act's remedies, and they preserve a litigant's right to relief under common law.[17] These sections disclose congressional recognition of the important role citizens can play in abating pollution of the waters of the United States.[18] Since federal common law must conform to the national policies declared by Congress, I conclude that provisions of the 1972 Amendments authorizing citizen suits sufficiently demonstrate that a citizen's invocation of the common law is not barred by prudential limitations on the exercise of the court's jurisdiction.[19]
 
 
 50
 I also conclude that the committee's cause of action is not barred by the axiom that a private person cannot enjoin a public nuisance. An exception to this doctrine permits a private action when the plaintiff suffers particular damages which are different from those inflicted on other members of the public. See W. Prosser, Law of Torts 586-91 (4th ed. 1971). The public harm in this case is the degrading of a natural resource. The private harm suffered by members of the committee who live in the vicinity of Jones Falls and frequent its banks is the personal injury they sustain from noxious odors, aesthetic offensiveness, and the threat to health caused by the discharge of raw sewage into the stream. Viewed in this light, standing provides a common denominator for suits brought under both the Act and federal common law. Thus, the lack of a personal stake, which bars a citizen's standing under both Article III and the 1972 Amendments of the Act, also serves to limit his right under federal common law to abate a public nuisance. But when a citizen demonstrates an injury to his person or property sufficient to satisfy constitutional and prudential restrictions on standing, I believe that he is entitled to invoke federal common law for the abatement of a public nuisance in the waters of the United States. See Restatement (Second) of Torts § 821C (Tent.Draft No. 17, 1971).
 
 
 51
 Finally, I believe that the court should not address important issues bearing on the outcome of this litigation at this stage of the proceedings. Resolution of preliminary questions relating to the jurisdictional amount and to the actual as distinguished from the alleged standing of the complainants must await the presentation of evidence. Moreover, when considering the merits, the district court must decide the extent to which the 1972 Amendments and new federal regulations "pre-empt the field of federal common law of nuisance." See Illinois v. Milwaukee, 406 U.S. 91, 107, 92 S.Ct. 1385, 1395, 31 L.Ed.2d 712 (1972). But this should be done only after the evidence has been developed. Federal statutes can then provide useful guidelines to the court as it appraises the equities of the case in the light of all the facts. See Illinois, 406 U.S. at 103, n. 5, and 107, 92 S.Ct. 1385.
 
 
 52
 I would, therefore, remand this case to the district court with directions that it allow the committee to amend its complaint, consider the question of jurisdictional amount, and decide whether the facts support the committee's claim to standing. If these preliminary issues are resolved in favor of the appellants, the district court should hear and decide the case on its merits.
 
 
 53
 ALBERT V. BRYAN, Senior Circuit Judge, and CRAVEN, Circuit Judge, join in this dissent.
 
 
 
 [1]
 See Friendly, "In Praise of Erie and the New Federal Common Law." 39 N.Y.U.L.Rev. 383 (1964)
 
 
 [2]
 There is a body of federal common laws for the implementation and enforcement of federal constitutional grants and guarantees and, more particularly, for the settlement of interstate boundary disputes. See Monaghan, Forward: Constitutional Common Law, The Supreme Court, 1974 Term, 89 Harv.L.Rev. 1 (1974)
 
 
 [3]
 Texas v. Pankey, 10 Cir., 441 F.2d 236
 
 
 [4]
 Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972)
 
 
 [5]
 Such a body of federal common law had been applied before Erie. In Georgia v. Tennessee Copper Company, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) the Supreme Court held that the State of Georgia was entitled to injunctive relief against the discharge of noxious fumes from copper works located in Tennessee where the evidence showed that the fumes were destroying forests and crops over a large section of Georgia
 
 
 [6]
 See Monaghan, Forward: Constitutional Common Law, The Supreme Court, 1974 Term, 89 Harv.L.Rev. 1 (1974); Note, "Federal Jurisdiction Environmental Law Nuisance State Ecological Rights Arising Under Federal Common Law Texas v. Pankey, 10 Cir., 441 F.2d 236, 1972 Wis.L.Rev. 597
 
 
 [7]
 United States v. Ira S. Bushey & Sons, Inc., D.Vt., 363 F.Supp. 110, affd. 2 Cir., 487 F.2d 1393, and see United States v. Lindsay, E.D.N.Y., 357 F.Supp. 784, 794, but see United States ex rel. Scott v. United States Steel Corp., N.D., Ill., 356 F.Supp. 556, in which it was held that the State of Illinois, as well as the United States, had a right of action to abate the nuisance, though there appeared to be no allegation of any interstate effect. The question is not before us, but the proposition of these cases may be questionable now that the 1972 Amendments of the Federal Water Pollution Control Act are effective. See Reserve Mining Co. v. Environmental Protection Agency, 8 Cir., 514 F.2d 492, 520, 521, 532
 
 
 [8]
 It is not essential that one or more states be formal parties if the interests of the state are sufficiently implicated. In Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938), the plaintiff was the Ditch Co. complaining of the denial by Colorado officials of rights to withdraw water from the La Plata River. The defendants undertook to justify their conduct on the basis of an interstate compact between the states of Colorado and New Mexico which had been approved by the Congress of the United States. Enforcement of the plaintiff's claim would have denied New Mexico waters which the compact allocated to it
 
 
 [9]
 Congress recognized the continuing validity of state common law nuisance actions in subsection 1365(e) of the Amendments
 
 
 [1]
 Sewage is defined by statute as a pollutant. 33 U.S.C. § 1362(6)
 
 
 [2]
 33 U.S.C. § 1251(a)(1)
 
 
 [3]
 33 U.S.C. § 1362(7)
 
 
 [4]
 S.Conf.Rep.No.92-1236, 92d Cong., 2d Sess. 144, 2 U.S.Code Cong. and Admin.News, pp. 3776, 3822 (1972)
 
 
 [5]
 40 C.F.R. § 125.1(p)(2)
 
 
 [6]
 33 U.S.C. § 407
 
 
 [7]
 Previous federal water pollution control legislation established water quality standards to be achieved in the affected bodies of water. Recognizing the difficulty of attacking pollution already in the water, Congress shifted its emphasis in the 1972 Amendments to eliminating discharge of pollutants. See Environmental Protection Agency v. California ex rel. Water Resources Control Bd., --- U.S. ----, 96 S.Ct. 2022, 48 L.Ed.2d 528, 44 U.S.L.W. 4781 (U.S. June 7, 1976) (dictum); II Environmental Policy Division of the Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, 1303 (Senate Comm. on Pub. Works Print 1973); McThenia, An Examination of the Federal Water Pollution Control Act Amendments of 1972, 30 Wash. & Lee L.Rev. 195, 198-206 (1973)
 
 
 [8]
 33 U.S.C. § 1251(b) provides in part:
 "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."
 
 
 [9]
 See, for example, the following provisions in the 1972 Amendments: 33 U.S.C. § 1251(a) (establishing national goals for elimination of pollution), § 1316(c) (allowing state enforcement if its standards comply with federal regulation), § 1319(a)(2) (allowing the Administrator to enforce pollution limitations if a state fails to), and § 1370 (providing that no state standard may be less stringent than the federal regulations)
 
 
 [10]
 33 U.S.C. § 1365 provides in part:
 "(a) (A)ny citizen may commence a civil action on his own behalf
 (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .
 "The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.
 "(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).
 "(g) For the purposes of this section the term 'citizen' means a person or persons having an interest which is or may be adversely affected."
 
 
 [11]
 A distinction, however, must be made between a suit brought under the Act and a suit brought solely under federal common law. Under the latter, proof of the jurisdictional amount is required by 28 U.S.C. § 1331(a). See Illinois v. Milwaukee, 406 U.S. 91, 98, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). Whether a court that has acquired jurisdiction under § 505(a) of the Act (33 U.S.C. § 1365(a)) can also hear a common law claim without proof of the jurisdictional amount required by 28 U.S.C. § 1331(a) has not been briefed or argued on this appeal. I would request the parties to brief this question for the district court on remand
 
 
 [12]
 Cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); Friendly, In Praise of Erie And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383 (1964)
 
 
 [13]
 33 U.S.C. § 1365(e). See note 10 supra
 
 
 [14]
 Federal common law falls within the definition of "laws of the United States" in 28 U.S.C. § 1331(a). See Stream Pollution Control Bd. v. United States Steel Corp., 512 F.2d 1036, 1039 (7th Cir. 1975); Ivy Broadcasting Co. v. American Telephone & Telegraph Co., 391 F.2d 486, 492 (2d Cir. 1968)
 
 
 [15]
 In developing the federal common law of water pollution, the district courts may draw on the policies expressed in the 1972 Amendments, other federal legislation such as the Rivers and Harbors Act of 1899, principles of the federal common law of nuisance, and applicable state laws. See generally H. Hart & H. Wechsler, The Federal Courts and the Federal System 762-70, 800-06 (2d ed. 1973)
 
 
 [16]
 Section 505(e) (33 U.S.C. § 1365(e)); see Natural Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 510 F.2d 692, 699-703 (1975)
 
 
 [17]
 See note 10 supra
 
 
 [18]
 See Natural Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 510 F.2d 692, 699-703 (1975)
 
 
 [19]
 The legislative history of 33 U.S.C. § 1365 indicates that the definition of a citizen eligible to sue under the Act in § 1365(g) was intended to grant standing to the widest extent possible under Article III of the Constitution. In the House debate on the conference version of the 1972 Amendments, a proponent of the legislation described § 1365(g) as follows:
 "This language is based on section 10 of the Administrative Procedure Act, 5 U.S.C. § 702, and the interpretation given to that section by the Supreme Court in Sierra Club v. Morton . . . .
 "The conferees followed the Court's opinion. A citizen suit may be brought under the conference agreement by those persons or groups . . . whose environmental . . . interest is or may be injured by a violation of the act . . . ." I Environmental Policy Division of the Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, 249-50 (Senate Comm. on Pub. Works Print 1973).