**STORAGE AND OFFICE SYSTEMS, LLC, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 4:04–CV–0190–DFH–WGH.**

United States District Court, S.D. Indiana, New Albany Division.

March 30, 2007.

Stephen F. Schuster, Ogden Newell & Welch, Thomas M. Williams, Stoll Keenon Ogden PLLC, Louisville, KY, for Plaintiff.

Douglas William Snoeyenbos, Department of Justice, Tax Division, Washington, DC, Jeffrey L. Hunter, United States Attorney's Office, Indianapolis, IN, for Defendant.

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

The federal government seeks in this case to enforce a late-filed tax lien against an independent company that bought the assets of a delinquent taxpayer. The government seeks to enforce its late-filed lien by a novel extension of a common law theory of successor liability, even though the government must lose under the statute that squarely addresses the issue, 26 U.S.C. § 6323. The court rejects the attempt, applies the statute, and holds the lien invalid against plaintiff.

Plaintiff Storage and Office Systems, LLC ("SOS, LLC") (formerly Maviba, LLC) purchased many of the assets of Storage and Office Systems, Inc. ("SOS, Inc.") under a purchase agreement (the "Agreement") whereby Maviba, LLC also assumed many of the liabilities of SOS, Inc. The Agreement, however, explicitly excluded SOS, Inc.'s unpaid federal tax liabilities, which amounted to $145,536.13, from the liabilities assumed by Maviba, LLC. After failing to collect the past-due taxes from SOS, Inc., the federal government filed a notice of federal tax lien against SOS, LLC. The government seeks to recover the tax liabilities of SOS, Inc. from SOS, LLC under a federal common law theory of successor liability. SOS, LLC has filed this suit to remove the lien. Both parties have moved for summary judgment. The court must grant the

plaintiff's motion and deny the government's motion.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict. The question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. Only genuine disputes over material facts can prevent a grant of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable trier of fact to find for the non-moving party. *Id.* at 248, 106 S.Ct. 2505.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Id.* at 251–52, 106 S.Ct. 2505.

The fact that both sides have filed cross-motions for summary judgment does not alter the applicable standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact. *E.g., Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993); *Harms v. Laboratory Corp. of America*, 155 F.Supp.2d 891, 905–06 (N.D.Ill.2001). Thus, in considering cross-motions for summary judgment, the court must consider the evidence through two lenses. When considering the government's motion for summary judgment, the court must give SOS, LLC the benefit of all conflicts in the evidence and the benefit of all reasonable inferences that might be drawn from the evidence in its favor. When considering the motion of SOS, LLC, the roles are reversed. Because the court is granting the motion of SOS, LLC, the facts set forth below are either undisputed or reflect the evidence in the light reasonably most favorable to the government.

### Facts For Summary Judgment

SOS, Inc. engaged in the business of material handling and storage systems in Jeffersonville, Indiana. SOS, Inc. failed to pay its federal employment taxes over seven separate quarters from 2001 to 2003. By September 2003, SOS, Inc. had an unpaid federal tax liability of $145,536.13. On October 14, 2003, the Internal Revenue Service filed a notice of federal tax lien against SOS, Inc. The government's attempts to collect the unpaid employment taxes from SOS, Inc. were unsuccessful. The assessed amount remains due and owing to the United States.

Maviba, LLC was formed in 2002 by Mark Barter, who was the sole member of the limited liability company. Before May 9, 2003, Maviba, LLC did not have any assets, liabilities, or employees, but had been actively pursuing, unsuccessfully, the acquisition of other companies. On May 9, 2003, Barter, on behalf of Maviba, LLC, and Ron Frazier, on behalf of SOS, Inc., entered into an agreement under which Maviba, LLC agreed to purchase the assets of SOS, Inc. On the advice of Barter's counsel, the sale was structured as an asset purchase rather than a stock sale so that Maviba, LLC would not automatically inherit the liabilities of SOS, Inc. Under the Agreement, Maviba, LLC acquired most of the assets of SOS, Inc. in exchange for assuming most of its liabilities. Section 4.1 of the Agreement, however, explicitly excluded "pre-existing tax liability of any kind" from the liabilities to be assumed by Maviba, LLC. The total value of the purchase was $502,326, but SOS, Inc. did not receive any cash in connection with the Agreement.

Barter knew that SOS, Inc. was behind in its federal employment taxes when he signed the Agreement. Before signing the Agreement, Barter instructed his company's attorney to search public records to see if the Internal Revenue Service had filed a notice of federal tax lien in the name of SOS, Inc. At the time the Agreement was signed, no such lien had been filed.

Soon after the Agreement was signed, Maviba, LLC changed its name to Storage and Office Systems, LLC. The SOS name with its familiarity among SOS, Inc.'s customers was one of the major assets purchased by Maviba, LLC under the Agreement. The newly renamed SOS, LLC engaged in the same type of business activities as SOS, Inc. It operated from the same building that SOS, Inc. had used. A pre-existing lease agreement between Biltco Corp. and SOS, Inc. was assigned to Maviba, LLC as part of the Agreement. SOS, LLC and Biltco Corp. complied with the terms of that assigned lease agreement until late 2004 or early 2005, when they signed a new lease agreement. The "Storage and Office Systems" building sign that SOS, Inc. had used remained on the building occupied by SOS, LLC until March 2005. SOS, LLC used the same telephone and fax numbers that SOS, Inc. had used. The internet web site that had been used by SOS, Inc. stayed in operation after the Agreement was signed and was modified to describe the acquisition as a change in ownership.

Before the sale, SOS, Inc. owed money to Bank One under one or two promissory notes. The bank debt was secured by all of SOS Inc.'s inventory, accounts receivable, chattel paper, equipment, and general intangibles. By written agreements dated May 14, 2003, Maviba, LLC assumed this secured debt and gave Bank One the same security for the debt that had been given by SOS, Inc.

Maviba, LLC acquired most of the inventory of SOS, Inc. as part of the Agreement. It also acquired the computers of SOS, Inc. and the information on those computer, including sales records. All of the customers of SOS, Inc. were told of the change in ownership. The top ten customers were called on personally by Barter and Frazier. The medium sized customers were called and told what had happened. Both the medium and small sized customers were sent a letter telling of the sale of the business. The majority of the suppliers for SOS, LLC after the Agreement was signed had also supplied SOS, Inc. At least some of the SOS, Inc. vendors who claimed a balance due received letters asking them to send copies of their invoices to SOS, LLC. After signing the Agreement, SOS, LLC rehired four of the eight or nine

people who had been employed by SOS, Inc. SOS, LLC then began business under the management of Barter with the assets that had been purchased from SOS, Inc.

In 2004, after failing to collect the past-due employment taxes from SOS, Inc., the Internal Revenue Service filed notices of federal tax lien against SOS, LLC. After exhausting administrative remedies, SOS, LLC filed this action under 28 U.S.C. § 2410 to remove the liens. The government asserted a counterclaim to recover the tax liability of $140,032.75, plus interest and other additions. Additional facts are noted below as needed, keeping in mind the standard for summary judgment.

### Discussion

The Federal Tax Lien Act of 1966, 26 U.S.C. § 6321, established a lien in favor of the government against property owned by a delinquent taxpayer.[1] The Act also created several exceptions that would defeat the government's tax lien against those who held certain interests prior to the government's filing of a tax lien. Section 6323(a) of the Internal Revenue Code provides: "The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." (Subsection (f) spells out the details for how and where the liens must be filed.)

In amending Section 6323 as part of the Federal Tax Lien Act of 1966, Congress intended to " 'improv[e] the status of private secured creditors' and prevent impairment of commercial financing transactions by 'moderniz[ing] ... the relationship of Federal tax liens to the interests of other creditors.'" *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 738, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (alterations in original), quoting S.Rep. No. 89–1708, at 1–2 (1966), reprinted in 1966 U.S.C.C.A.N. 3722, and H.R.Rep. No. 89–1884, at 35 (1966). The Senate report explained that the bill was "in part an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in [the] Uniform Commercial Code." S.Rep. No. 89–1708, at 1–2 (1966), reprinted in 1966 U.S.C.C.A.N. at 3722.

Prior to the 1966 Act, federal tax liens had been authorized by statute, but the statutes had not specified priority rules for resolving conflicts between federal tax liens and rival liens. *Kimbell Foods, Inc.,* 440 U.S. at 721 n. 6, 99 S.Ct. 1448. The 1966 Act set specific priorities to displace the "choateness" and first-in-time doctrines developed by the Supreme Court. *Id.* at 720–21 & nn. 7–8, 99 S.Ct. 1448, citing 26 U.S.C. §§ 6323(b), (c), (d), and (e).

Even before the 1966 Act, Section 6323 was designed "to give notice to would-be purchasers of the government's right to collect taxes due from the owners of the property." *Elliott v. Sioux Oil Co.,* 191 F.Supp. 847, 851 (D.Wyo.1960), quoting *Pipola v. Chicco,* 169 F.Supp. 229, 233 (S.D.N.Y.1959). Without such notice, purchasers of assets might unwittingly inherit secret liabilities that were not bargained for in the purchase. See *United States v. Gilbert Associates, Inc.,* 345 U.S. 361, 363–64, 73 S.Ct. 701, 97 L.Ed. 1071 (1953) ("Congress enacted § 3672 [later codified as § 6323] to meet the harsh condition created by the holding in *United States v.*

---

1. Section 6321 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

*Snyder,* 149 U.S. 210, 13 S.Ct. 846 [1893], ... that a secret federal tax lien was good against a purchaser for value without notice."); *Elliott,* 191 F.Supp. at 851 ("In passing Section 6323, Congress also was provoked to avoid the evils and insidious effect of secret federal tax liens.").

Section 6323(a) protects a "purchaser" from unfiled tax liens. Section 6323(h)(6) defines "purchaser" as "a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchaser without actual notice...." In this case, the government concedes that Maviba, LLC qualified as a purchaser under Section 6323(a). The undisputed facts show that Maviba, LLC purchased SOS, Inc. "for adequate and full consideration in money or money's worth" on May 9, 2003, before the government filed notices of a federal tax lien against SOS, Inc. on October 14, 2003.

■ Thus, under Section 6323, the government's tax lien against SOS, LLC must be set aside. To avoid this result, the government argues that even though SOS, LLC qualifies as a purchaser under Section 6323, the company should be liable for the tax liabilities as a successor in interest to SOS, Inc. The government's position is summarized in its response to SOS, LLC's motion:

> [T]he United States is not relying on the legal principle that liens that have attached to specific assets remain attached to those assets even after their ownership is transferred to a different entity. Rather, in this case, the United States is relying on the completely unrelated doctrine of successor liability, under which a successor in interest is liable for any of the debts of its predecessor, even those debts which the successor did not explicitly agree to pay. Thus, it is the United States' position that because the plaintiff

is liable in its own right for the taxes unpaid by SOS, Inc. that federal tax liens have attached to all of the property and rights to property of the plaintiff, not just those assets that it acquired from SOS, Inc., under the agreement of May 9, 2003.

■ The default rule governing asset purchases is that the purchaser does not acquire the seller's liabilities unless she agrees to do so. *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1424 (7th Cir.1993); *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977). The purpose of this rule parallels Congress's purpose in passing Section 6323: to prevent the impairment of commercial transactions by avoiding the "evils and insidious effect" of unknown and unbargained for liabilities. "If the liabilities always went with the assets, it would be difficult to sell assets because the purchaser would not know what he was getting." *Chaveriat,* 11 F.3d. at 1424. Without this rule, the purchaser might find that he inherited hidden liabilities, the "cost of which exceeded the value of the asset purchased, yet it would be too late for him to back out of the sale or renegotiate the price." *Id.* As the Seventh Circuit explained:

> "The rule permitting assets to be sold separately from liabilities is part of a large family of rules aimed at facilitating transactions by clearing clouds on titles. Another member of the family is the [U.C.C.] rule that a bona fide purchaser for value takes free of certain claims against the seller in respect to the good sold."

*Id.* This reasoning fits nicely with the Supreme Court's explanation in *Kimbell Foods* that Congress intended Section 6323 to be a member of that same large family of rules to modernize the relationship between federal tax liens and the interests of other creditors. See 440 U.S.

at 738; S.Rep. No. 89–1708, at 1–2 (1966), reprinted in 1966 U.S.C.C.A.N. at 3722.

As with most default rules, parties can choose to contract otherwise. "If, not trusting the default rule [that the purchaser does not acquire the seller's liabilities], or wanting to vary it, the parties have specified whether liabilities are to be retained by the seller or assumed by the buyer, the court will enforce the specified allocation and the default rule drops out." *Chaveriat,* 11 F.3d. at 1425, citing *American Xyrofin, Inc. v. Allis–Chalmers Corp.,* 230 Ill.App.3d 662, 172 Ill.Dec. 289, 595 N.E.2d 650, 658–59 (1992). In this case, the private parties' agreement explicitly excluded SOS, Inc.'s tax liabilities from the liabilities that Maviba, LLC would assume under the Agreement.

The default rule concerning asset sales provides the broader context here, so that Section 6323 can be seen in relation to other laws governing such transactions in general and to illustrate that Section 6323 has adopted the philosophy behind the default rule of protecting good faith purchasers. The government does not argue that SOS, LLC falls under some of the common exceptions to the default rule.[2] Nor does the government argue that SOS, LLC does not qualify as a purchaser under Section 6323. Def. Br. at 5. Instead, the government argues that SOS, LLC is liable under a federal common law theory of successor liability.

■■■■ In the face of Section 6323, which directly addresses the issue of lien priority in this case, the government's reliance on federal common law is not at all persuasive. As a general matter, federal courts are not general common-law courts and do not possess a general power to develop and apply their own rules of decision. *City of Milwaukee v. Illinois,* 451 U.S. 304, 312–315, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), citing *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Supreme Court explained in *City of Milwaukee v. Illinois:*

> We have always recognized that federal common law is "subject to the paramount authority of Congress." *New Jersey v. New York,* 283 U.S. 336, 348, 51 S.Ct. 478, 75 L.Ed. 1104 (1931). It is resorted to "[i]n absence of an applicable Act of Congress," *Clearfield Trust,* [318 U.S. 363, 367, 63 S.Ct. 573 (1943) ], and because the Court is compelled to consider federal questions "which cannot be answered from federal statutes alone," *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 469, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Jackson, J., concurring). See also *Board of Commissioners v. United States,* 308 U.S. 343, 349, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 594, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Miree v. DeKalb County,* 433 U.S. 25, 35, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (Burger, C. J., concurring in judgment). Federal common law is a "necessary expedient," *Committee for Consideration of Jones Falls Sewage System v. Train,* 539 F.2d 1006, 1008 (C.A.4 1976) (en banc), and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusu-

---

**2.** Neither the default rule nor an express modification of it will be enforced under the following circumstances: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a 'mere continuation' of the seller; and (4) where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977). None of these conditions are satisfied in this case.

al exercise of lawmaking by federal courts disappears.

451 U.S. at 313–14, 101 S.Ct. 1784. "Where a legislatively enacted regulatory scheme speaks 'directly to a question,' courts should not supplement or modify the scheme by reference to federal common law." *In re Alterra Healthcare Corp.,* 353 B.R. 66, 75 (Bkrtcy.D.Del.2006), citing *City of Milwaukee,* 451 U.S. at 315, 101 S.Ct. 1784; accord, *Ivey v. Harney,* 47 F.3d 181, 184 (7th Cir.1995) ("Statutes and rules supersede the common law powers of the federal courts."). "While reference to common-law conceptions is often a helpful guide to interpreting open-ended or undefined statutory terms, this principle is a guide to legislative intent, not a talisman of it, and the principle is not to be applied in defiance of a statute's overriding purposes and logic." *United States v. Locke,* 471 U.S. 84, 98, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (citations omitted).

The government suggests here that there is a compelling national policy at stake, citing *Bull v. United States,* 295 U.S. 247, 259, 55 S.Ct. 695, 79 L.Ed. 1421 (1935) for the proposition that "taxes are the lifeblood of government, and their prompt and certain availability an imperious need." This important national policy, however, cannot override a restriction on the ability of the government to collect taxes that Congress explicitly enacted in the tax code through Section 6323. The Supreme Court explained:

> The Federal Tax Lien Act of 1966 … provides further evidence that treating the United States like any other lender would not undermine federal interests. These amendments modified the Federal Government's preferred position under the choateness and first-in-time doctrines, and recognized the priority of many state claims over federal tax liens…. To ignore Congress' disapproval of unrestricted federal priority in an area as important to the Nation's stability as taxation would be inconsistent with [the Court's] function [to effectuate congressional policy]. Thus, without a showing that application of state laws would impair federal operations, we decline to extend to new contexts extraordinary safeguards largely rejected by Congress.

*United States v. Kimbell Foods, Inc.,* 440 U.S. at 738, 99 S.Ct. 1448. To allow the government to accomplish via successor liability what Congress has explicitly precluded under Section 6323 would defy the statute's terms, overriding purposes, and logic. Section 6323 speaks directly to the question before this court: a buyers' liability for a seller's tax debts based on a later-filed lien. The court should not supplement or modify the scheme established by Section 6323 by applying federal common law that may undermine Congressional intent and even the normal functioning of commerce.

■ The government has offered only meager support for its successor liability theory based on other decisions dealing with tax liens. Instead, the government has tried to support its theory primarily with cases applying the theory in employment contexts—wages owed, liabilities to employee benefit plans, liability for employment discrimination—where there is no statutory guidance comparable to Section 6323 as applied to tax liens. Successor liability is an equitable doctrine under federal common law. Although it is similar in theory to the "mere continuation" theory mentioned above in note 2, "successor liability under federal common law is broader still." *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 49 (7th Cir.1995) (applying theory to withdrawal liability for multiemployer pension fund). Successor liability "allows lawsuits against even a genuine-

ly distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was 'substantial continuity in the operation of the business before and after the sale.'" *Chicago Truck Drivers*, 59 F.3d at 49, quoting *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 748 (7th Cir.1994) (successor corporation liable for age discrimination violation).

The government's theory of successor liability is grounded in labor law decisions and appears to have little or no application outside of the employment context. The Supreme Court first considered the doctrine of successor liability in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). That case arose under section 301 of the National Labor Relations Act. The Court's holding that a successor must bargain with a union recognized by its predecessor was premised specifically on considerations of national labor policy. Subsequent cases that came before the Court were governed by similar considerations. As the Seventh Circuit has noted, the *Livingston* Court found that successor liability was applicable because it "promoted the well-established national policy of 'extending protection to and providing relief to the victims of prohibited employment practices.'" *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 746 (7th Cir.1985), quoting *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir.1974). See, *e.g., Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

In *Musikiwamba* the Seventh Circuit relied upon the Supreme Court's reasoning in the labor cases when it extended successor liability to employment discrimination cases, a modest extension still firmly rooted in the employment relationship, without more specific statutory guidance. In summarizing the Supreme Court's reasoning, and in justifying the modest extension of successor liability to employment discrimination, the Seventh Circuit cited these considerations favoring extension: (1) an overriding policy against unfair and arbitrary employment practices, (2) the inability of a victim of the illegal employment practice to protect himself from a change in ownership, and (3) the ability of the successor to provide relief at a minimum cost, at least in an individual case. *Musikiwamba*, 760 F.2d at 746. These factors clearly do not apply to the undisputed facts of this case, especially since Congress has directly addressed the problem with Section 6323.

The government has cited without discussing three cases that it claims applied the successor liability doctrine in the context of unpaid federal taxes. On close examination, they do not support creation of a common law substitute or alternative for Section 6323, at least where there has been a genuine change in control and ownership of the taxpayer's business.

In *Today's Child Learning Center Inc. v. United States*, 40 F.Supp.2d 268 (E.D.Pa.1998), the plaintiff corporation, Today's Child, sought the return of a sum levied against it by the United States for the unpaid taxes of its predecessor, Wee Care. The officers and shareholders of Today's Child were virtually identical to those of Wee Care, with control of the two corporations remaining in the same hands. In addition, the court found that:

Today's Child assumed the business of Wee Care at the same premises used by Wee Care by providing the same full time day care services. Today's Child used the same offices, the same classrooms, the same furniture and video equipment, as well as the same toys and

play equipment used by Wee Care in providing day care services. Today's Child used the same telephone and facsimile number as Wee Care, as well as the same mailing address.... Furthermore, there is little evidence that Today's Child was adequately capitalized, that it actually issued stock, or that it observed corporate formalities aside from one board meeting. Wee Care checks were deposited into a Today's Child bank account, and Today's Child checks were deposited into Wee Care's bank account. On the two checking accounts at Commerce Bank, the names Wee Care and Today's Child appear on the same signature cards. Parents were led to believe that Wee Care and Today's Child were one and the same. The teachers' duties remained the same, the tuition remained the same, and the curriculum remained the same. Many of the children were transferred from Wee Care to Today's Child when Wee Care ceased operating as a going concern.

*Id.* at 273–74. The most important consideration in the court's reasoning was the fact that "the same person exercised exclusive control over the operations of both Wee Care and Today's Child...." *Id.* at 274. The court's analysis of the "Continuation/De Facto Merger/Successor in Interest" theories was essentially one inquiry. The court concluded that Today's Child was the mere continuation and alter ego of Wee Care, and that there was a *de facto* merger. The court's use of the term "successor in interest" was not necessary to its decision, and the court certainly did not address the problems posed by departing from the standards of Section 6323 if a common law doctrine of successor liability were applied.

The undisputed facts in this case are very different from those in *Today's Child.* Maviba, LLC was a legitimate business entity, independent, separate, and distinct from SOS, Inc. Maviba, LLC was owned and controlled by an officer who was independent, separate, and distinct from SOS, Inc.'s owner and officer. The government does not argue that SOS, LLC is a mere continuation of SOS, Inc. or that SOS, LLC is the alter ego of SOS, Inc. or that there was a *de facto* merger between SOS, LLC and SOS, Inc. The undisputed facts in this case establish that none of those theories are satisfied. Most important, *Today's Child* did not involve a purchaser of any kind, let alone a purchaser under Section 6323(a). Thus, the mention of successor liability in *Today's Child* was *obiter dicta,* and the case is easily distinguishable from this one, in which the government is trying to establish applicability of a common law theory of successor liability where other theories clearly are not applicable.

The government also cites without discussion *Ross Controls, Inc. v. United States,* 160 B.R. 527 (E.D.Pa.1993), and *Ross Controls, Inc. v. United States,* 164 B.R. 721 (E.D.Pa.1994), as a case that applied the successor liability theory in the context of unpaid federal taxes. Although the case used the phrase "successor corporation," the court did not adopt the theory of successor liability proposed by the government in this case. Instead, the case hinged on the application of the mere continuation and alter ego theories under Pennsylvania common law. The case did not involve a purchaser under Section 6323(a). The case is inapplicable here.

In other words, the government has failed to come forward with any applicable case law applying a common law theory of successor liability to enforce a later-filed federal tax lien against a taxpayer who qualifies as a "purchaser" within the meaning of 26 U.S.C. § 6323. Under the plain meaning of 26 U.S.C. § 6321 as applied to the undisputed facts of this case, plaintiff SOS, LLC was a "purchaser" within the

meaning of 26 U.S.C. § 6323(a), and its interest primes and defeats the government's tax lien, which was filed only after the plaintiff acquired the assets of SOS, Inc.

### Conclusion

For the foregoing reasons, the United States' motion for summary judgment (Docket No. 20) is DENIED and the plaintiff's motion for summary judgment (Docket No. 25) is GRANTED. The court will enter final judgment for plaintiff.

So ordered.